COMMONWEALTH vs. CHRIS DANA BRADSHAW.

Plymouth. October 5, 1981. — February 12, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, & LYNCH, JJ.

*Arrest. Arrested Person. Constitutional Law*, Arrest, Admissions and
confessions, Waiver of constitutional rights, Assistance of counsel. *Evi-
dence*, Admissions and confessions, Other offense, Photograph. *Prac-
tice, Criminal*, Assistance of counsel, Comment by prosecutor, In-
structions to jury, Capital case.

A defendant's warrantless arrest was lawful, and the police acted reasona-
bly and under exigent circumstances in arresting him outside his apart-
ment from which police had lured him by a ruse, where circumstances
indicated that the police officers had probable cause to believe the de-
fendant was guilty of murder, that they had strong reason to believe he
was armed and at home, that there was a likelihood that he would es-
cape if not immediately apprehended, and that it was impracticable
for them to obtain a warrant. [252-257]

A confession of a defendant charged with murder was the product of his
free will and suppression would not have been required, even if his
arrest were held unlawful, where the defendant was given Miranda
warnings at least twice before his confession, his tape-recorded inter-
rogation began nearly two hours after his arrest, there was no insistent
questioning or other pressure by the police, and the defendant's confes-
sion was a direct product of an intervening circumstance, namely, his
hearing a statement of his companion which implicated him in the vic-
tim's death. [258-259]

A confession by a defendant charged with murder, who initially waived
his Miranda rights prior to questioning by police, was not rendered in-
admissible on the basis that he was deprived of the assistance of
counsel, where the defendant did not request an attorney at any point
during the questioning and where it did not appear that police had
been informed that the defendant's family were seeking an attorney
for him [263-264]; nor was the defendant's right to counsel impaired
by failure of the police to tell him that his brother was present at the
police station [263-264].

A confession by a defendant charged with murder was not rendered inad-
missible on the basis that police failed to "scrupulously honor" his right
to terminate his interrogation, where a remark by the defendant,

taken in context, was insufficient to establish that he was asserting his right to halt further questioning and where his subsequent conduct indicated that his remark was not so intended. [264-265]

A confession by a defendant charged with murder was not rendered inadmissible by reason of his being deprived of his right under G. L. c. 276, § 33A, to use the telephone at a police station, where the record did not support a finding that he had been intentionally deprived of that right. [266]

A review of the over-all conduct of the police in arresting and interrogating a defendant charged with murder led this court to find no evidence on which the defendant's waiver of his Miranda rights could be found constitutionally invalid. [267-268]

At a murder trial, evidence of prior misconduct by the defendant on the day of the murder was properly admissible, in the judge's discretion, to establish a pattern of conduct during that day and to show premeditation. [268-270]

At a murder trial, the judge did not abuse his discretion in admitting in evidence photographs depicting the body of the victim. [270-271]

Reversal of a conviction of murder was not required by remarks in the prosecutor's closing argument, as to which objection was made, including the prosecutor's suggestion that the defendant had offered two inconsistent theories of defense in order to keep his options open until he saw how his witnesses would "hold up," the suggestion of a dual defense being supported by the evidence [271-272], the prosecutor's comments that two defense witnesses were changing their stories, such comments on an essentially collateral matter not seriously prejudicing the defendant [272-274], and the prosecutor's comments on excluded evidence that, even if improper, could have had little practical effect [274].

At a murder trial, no substantial risk of a miscarriage of justice resulted from alleged instances of prosecutorial misconduct as to which no objection was made or curative instruction requested, where the prosecutor's remarks were grounded in the evidence and the few extravagant remarks made were responsive to equally extravagant defense tactics in final argument. [275-277]

At a murder trial, the judge did not err in his instruction to the jury on implied malice, which did not relieve the prosecution of its burden to prove malice beyond a reasonable doubt [277-278], on the prosecution's burden of proof [279], on the jury's duty, if they found the defendant guilty, to return a verdict in the highest degree proved beyond a reasonable doubt [279], and on the elements of self-defense and provocation [279-280].

INDICTMENT found and returned in the Superior Court on June 29, 1977.

The case was tried before *Prince*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Kevin J. Reddington* for the defendant.

*Rosemary Ford*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. On August 19, 1977, the defendant, Chris Dana Bradshaw, was convicted of murder in the second degree on an indictment charging murder and was sentenced to life imprisonment at the Massachusetts Correctional Institution at Walpole. The defendant filed a claim of appeal in the Appeals Court and we granted his motion for direct appellate review.

The body of Kevin T. Kidd was found in a wooded area near the Abington-Whitman town border on the morning of May 29, 1977. Kidd had died from a shotgun wound to the neck. The police were led to the body by Thomas Folsom, an acquaintance of the defendant who became the chief witness for the prosecution in the trial of the defendant for Kidd's murder. Folsom and the defendant were alone with Kidd when he was killed. Both testified at the trial and each accused the other of the murder.

In this appeal, the defendant claims that the trial judge erred in the following respects: (1) by refusing to suppress, as the fruit of an illegal arrest or as the product of an interview conducted in violation of the defendant's constitutional rights, a confession made by the defendant while in police custody; (2) by allowing the introduction of evidence of prior misconduct by the defendant and "gruesome photographs," both of which, it is alleged, lacked probative value and were highly prejudicial; and (3) by charging the jury on malice in a way which shifted to the defendant the burden of disproving malice. In addition, the defendant argues that his due process rights were violated by prosecutorial misconduct in the closing argument. Finally, the defendant urges this court to exercise its power under G. L. c. 278, § 33E,[1]

---

[1] Although the conviction involved was for murder in the second degree, we review pursuant to G. L. c. 278, § 33E, since the crime occurred

to order a new trial or to reduce the degree of guilt from murder to manslaughter. There was no error.

The following facts could have been found from the evidence introduced at trial. Folsom and the defendant had known each other for a number of years prior to 1977. On May 28, 1977, Folsom met the defendant at the defendant's home in Plympton. Early in the day Folsom bought a car owned by the defendant. The two men spent most of the day driving around together and stopping at various places in the towns of Abington, Brockton, Whitman, and Plympton. During the course of their travels, they picked up a shotgun and a .303 rifle and purchased a box of twelve gauge shotgun shells using Folsom's firearm identification card. The main business of the day was apparently to collect money allegedly owed to the defendant. The defendant was particularly interested in locating a Richard Alphonse, who he claimed owed him money. Angry at finding Alphonse neither at home nor at work, the defendant took some tools belonging to Alphonse and vandalized one of his trucks. When he later encountered Alphonse, the defendant threatened to kill him if he did not pay his debt. Alphonse testified to statements by the defendant reflecting a general edginess and a sense that he was being abused and taken advantage of by "everybody."

On the same day, the defendant was also involved in several confrontations with William Santiano, his sister Grace's boyfriend. These incidents stemmed from the defendant's belief that Santiano had stolen two tires which were missing from the defendant's garage. There was testimony that the defendant threatened to kill Santiano at three different points during the day. Santiano himself testified that on one of these occasions the defendant pointed an empty shotgun at him, pulled the trigger, and threatened to "get" him "before the night is over." At another point the defendant located Santiano's parked automobile and fired at it, first

before that statute was limited to convictions for murder in the first degree. See *Commonwealth* v. *Davis*, 380 Mass. 1, 16-17 (1980).

with the shotgun and, when that weapon misfired, with the rifle.

The defendant stopped by his parents' home three times during the day. During one visit he had an argument with his sister Grace and slapped her. During a later visit he had a confrontation with his mother and, according to Folsom, pointed the then empty shotgun at her. The defendant's mother denied being threatened by her son, but testified that after he left she called the police because Santiano had told her the defendant had a gun and she "was concerned that someone might get hurt."

During the afternoon of the day of the murder Folsom met one Glenn Carrico and gave him the rifle and shotgun, asking him to take the weapons to Folsom's apartment. Later in the afternoon the defendant and Folsom drove to Abington, where the defendant got out near some railroad tracks. He asked Folsom to retrieve the shotgun and rifle. Folsom left for the apartment. The defendant testified that he got out at the railroad tracks because he needed some time alone to "coo[l] down" and did not want the police "coming down there, shooting [him] up when [he had] . . . no weapons or anything."

Shortly after 6 P.M. Kevin Kidd, the murder victim, arrived at Folsom's apartment accompanied by Kenny Sprague. Kidd and Folsom had a confrontation concerning some money which Kidd had given Folsom to buy drugs. Kidd wanted the money back and Folsom claimed it had been stolen. There was testimony to the effect that Folsom believed Kidd had stolen the money. Kidd was carrying a .357 magnum revolver and threatened Folsom with it. Folsom's description of this scene was corroborated at trial by Sprague and Kathy Carrico (Carrico's wife) who lived in the same apartment as Folsom. Folsom eventually retrieved the defendant's shotgun from the apartment and, driving his own car, left with Kidd in the passenger seat. Folsom told Kidd that he was delivering the gun to a friend who would get Kidd's money.

Folsom and Kidd drove to the railroad tracks where the defendant was waiting. Folsom gave Kidd sixty dollars during the trip in partial payment of his debt. Folsom testified that Kidd's gun was hidden under his jacket on the floor of the car. When they found the defendant Folsom gave him the shotgun and made gestures warning him that Kidd was armed. According to Folsom, the defendant indicated that he understood the warning about Kidd's having a weapon. The defendant meanwhile loaded the shotgun with two shells and shot one into the ground. Folsom then asked the defendant if he would return the $150 Folsom had paid him for the car so that Folsom could pay Kidd. The defendant was agreeable.

At this point, the testimony of Folsom and the defendant diverge. According to Folsom, he had just started the car when the defendant, standing outside the vehicle, pointed the shotgun through a window and shot Kidd in the neck. When Folsom asked why he had shot Kidd, the defendant claimed that he had seen Kidd loading his gun and was afraid Kidd would kill them. Folsom testified that the defendant insisted that Folsom help remove the body to a drainage ditch and clean out the car. Folsom also discharged Kidd's gun and took the sixty dollars from Kidd's hand. Folsom and the defendant disposed of the shotgun in Hull and the defendant called his father collect to establish an alibi. They then drove to the defendant's home, where they cleaned the car more thoroughly and disposed of Kidd's gun and other evidence. At the defendant's direction Folsom also called Kathy Carrico and asked for Kidd in order to strengthen the alibi.

The defendant testified in his own defense. He claimed that when Folsom handed him the shotgun at the railroad tracks in Abington it was already loaded, that he asked why Folsom had brought a loaded shotgun with him, and that he handed the gun back to Folsom. The defendant testified that he got into the car and offered Kidd a beer, and that when he turned around to get the beer from the back seat, he heard an explosion and saw the wound in Kidd's neck.

Folsom told the defendant he had killed Kidd because Kidd had stolen money from him. He then threatened to kill the defendant and his family if the defendant told anyone about the incident. The defendant also gave testimony damaging to his own case. He admitted hitting his sister and shooting at Santiano's car. The defendant also testified that on the drive to Hull to dispose of the murder weapon he noticed a police cruiser behind them and told Folsom "if the cops come over here we're going to have to waste them."

In addition to testimony concerning the events of May 28-29, Police Chief Angus of the Plympton police department testified that four or five weeks earlier, the defendant had voluntarily turned over two rifles and a shotgun to police officers who had come to his apartment in response to a telephone call from the defendant. There had been a family argument and apparently the defendant had told the officers that he felt it best for the safety of all concerned that he turn the guns over to the police. After one week or so the defendant called to ask for the guns and they were returned to him by the department.

The circumstances of the defendant's arrest for Kidd's murder are important to the resolution of several of the defendant's claims of error. After Folsom and the defendant separated on the evening of the murder, Folsom went to see his uncle in Holbrook. He related the events of the day to his uncle and later consulted with his grandfather. Sometime before 10:30 the next morning (the Sunday of Memorial Day weekend), either Folsom or one of these relatives called the Whitman police station. Folsom was driven to the station by an Officer Robert Woods and was interviewed there by Lieutenant John Travers. After he led these two officers to the body, Folsom was taken to the Abington police station. The Abington police then called State police Detective-Lieutenant Frank Joyce, who was assigned to the office of the district attorney for Plymouth County. At 11:50 A.M., he arrived at the scene. He then went to the Abington police station where he interviewed Folsom. Meanwhile, a second State policeman, Trooper Robert Fernandes, was

called and went to the police station in Plympton, the town where the defendant lived, arriving there about 11:40 A.M. Trooper Fernandes spoke with Detective Joyce over the telephone between 12 noon and 12:30 P.M. and learned that Folsom had implicated the defendant in Kidd's death and had seen the defendant hide Kidd's .357 magnum in a trash can behind the defendant's Plympton apartment. During his call, Detective Joyce directed Trooper Fernandes to effect the defendant's arrest.

Trooper Fernandes and Chief Angus of the Plympton police department discussed the mechanics of the arrest. The defendant lived with his wife and infant son in an apartment over a luncheonette on Main Street in Plympton. Chief Angus was familiar with the building. The defendant testified that in May, 1977, a woman was renting two rooms within the five-room apartment. Chief Angus testified that he knew the five rooms on the second floor could be used for two apartments but thought they had always been rented as one apartment. He knew only that the defendant and his family were living upstairs. The second floor of the building could be reached either by an interior stairway at the back of the luncheonette or by an exterior stairway at the rear of the building. Twenty yards from the building there was another residence where seven people, five of them children, lived.

Chief Angus and Trooper Fernandes learned that Officer Stephen Brown from the Plympton station had been at the defendant's building at about 10:30 A.M. on the morning of May 29 to supervise the evacuation of the building because of a smoke fire in the luncheonette. The defendant had been in the luncheonette when Officer Brown arrived and had bolted up the stairs to his apartment when he saw the policeman. When Officer Brown had announced to all present that there was a fire and that they should leave, the defendant had come down and left with the others. Later, after the fire was under control, the defendant had had a brief conversation with Officer Brown.

Chief Angus and Trooper Fernandes decided to stage a false fire similar to the real one in order to effect the defendant's arrest. Officer Brown was to make the actual arrest since it was felt that, due to the earlier fire, his presence would not alarm the defendant. Chief Angus called the chief of the Plympton fire department and requested that he and two volunteers appear at the defendant's apartment in fire-fighting apparel. Trooper Fernandes and a fellow trooper, both in plain clothes, entered the first-floor luncheonette about 12:45 P.M. Trooper Fernandes estimated that there were sixteen to twenty customers in the luncheonette at this time. Chief Angus, two of his officers, and two more State troopers, all armed with shotguns, hid in the woods around the building. About 1 P.M. the fire fighters arrived, accompanied by Officer Brown, and went to the basement. Officer Brown called to the defendant to turn down his thermostat and, when the defendant came out onto the landing at the top of the exterior stairs, he arrested him.

The Commonwealth concedes that no warrant for the defendant's arrest was obtained. After the arrest, about 2:30 P.M., Trooper Fernandes did obtain two search warrants for the Main Street property. He and a partner met an assistant clerk at the latter's home in Plympton to explain their request and later drove the clerk to the District Court in Plymouth where an affidavit was prepared and the warrants were issued.

1. *Legality of the warrantless arrest.*

The defendant argues that a confession he made at the Abington police station after his arrest should be suppressed as the fruit of an illegal warrantless arrest.[2] The circumstances surrounding this confession are discussed in detail below in connection with those of the defendant's claims of error which relate more particularly to the confession itself. For present purposes, the facts already outlined will suffice.

---

[2] At the time the trial judge denied the defendant's substitute motion to suppress physical evidence and inculpatory statements, he said that he intended to make findings of fact on the issues presented by the motion. These findings, however, were never made.

We address ourselves first to the significance of the fact that a ruse was employed to lure the defendant out of his apartment so that he could be arrested. The Commonwealth argues that the warrantless arrest of the defendant on the landing at the top of the exterior stairway to his apartment should be upheld as a felony arrest in a "public place" on probable cause. See *United States* v. *Watson*, 423 U.S. 411 (1976). The defendant's position is that, since he was only induced to leave his home by the police ruse, it is constitutionally irrelevant that his arrest was effected in a technically public area. He contends that his arrest should be analyzed as a warrantless arrest in a home. In support of these arguments the defendant cites the Supreme Court's holding in *Payton* v. *New York*, 445 U.S. 573 (1980), that, absent exigent circumstances, "the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.* at 576.

In this case, there was clearly no physical intrusion by the police into the defendant's home in the course of his arrest. Arguably, though, the use of the fire ruse constitutes a kind of constructive or verbal "entry" by the police that implicates the same privacy interests protected by the holding in *Payton*. See *Payton* v. *New York, supra* at 588-589. See also *Katz* v. *United States*, 389 U.S. 347, 351 (1967) ("the Fourth Amendment protects people, not places"). We find it unnecessary to decide the issue raised by the Commonwealth's contention. Even if the arrest is analyzed as a warrantless arrest in the defendant's home, as urged by the defendant, we hold that it was justified by exigent circumstances. *Payton* v. *New York, supra* at 590. *Commonwealth* v. *Forde*, 367 Mass. 798 (1975). Under this view of the case, the ruse itself has no further significance. If the defendant could be legally arrested in his apartment without a warrant, he could just as legally be induced to come outside so that he could be arrested there. Cf. *Ponce* v. *Craven*, 409 F.2d 621, 626 (9th Cir. 1969) (the Constitution only prohibits police from obtaining entry through

subterfuge to a place where they have no right to be). The ruse employed by the police was simply an attempt to eliminate the possibility of violence suggested by the circumstances.

In this case the police had already obtained a statement from Folsom and had found Kidd's body when they went to the defendant's apartment building to effect an arrest. Thus the police conduct here meets the threshold requirement that the officers have probable cause to believe that a felony has been committed when they undertake a warrantless entry into a dwelling in order to make an arrest. *Commonwealth* v. *Saia*, 372 Mass. 53, 56-57 (1977). The legality of this arrest, therefore, hinges on whether there were "exigent circumstances" which justify the failure of the police to obtain an arrest warrant.

The Supreme Court has recognized that "a warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." *Michigan* v. *Tyler*, 436 U.S. 499, 509 (1978). The Court has also indicated that a serious risk of injury to police or others may justify a warrantless entry to arrest. *Warden* v. *Hayden*, 387 U.S. 294, 298-299 (1967). See Donnino & Girese, Exigent Circumstances for a Warrantless Home Arrest, 45 Alb. L. Rev. 90, 93-94 (1980). In *Payton* v. *New York, supra,* none of the lower courts which had reviewed the two convictions involved in the case relied on "exigent circumstances" to uphold the arrests. In light of this, the Supreme Court had "no occasion to consider the sort of emergency or dangerous situation . . . that would justify a warrantless entry into a home for the purpose of either arrest or search." *Id.* at 583. It might be noted, though, that the Court found it at least "arguable" that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances. That entry occurred at 7:30 A.M. and followed two days of "intensive investigation" into a murder. The investigation had produced sufficient evidence to establish probable cause to

believe Payton guilty of the murder. *Payton* v. *New York*, *supra* at 576.

In *Commonwealth* v. *Forde*, 367 Mass. 798 (1975), where we anticipated the conclusion reached in *Payton*, the Commonwealth sought to excuse the lack of an arrest warrant by showing exigent circumstances. We identified the following as factors which would tend to support a finding of exigency: (1) a crime of violence, (2) a showing that the suspect was armed, (3) a clear demonstration of probable cause, (4) strong reason to believe the suspect was at home, and (5) a likelihood that the suspect would escape if not apprehended. *Id.* at 807. In addition, we noted that the reasonableness of police conduct could be further tested by such factors as whether the entry is peaceable and whether the entry is at night. *Id.* We have, of course, never held that all of these factors must be present to support a finding of exigent circumstances.

We conclude that the circumstances of the defendant's warrantless arrest establish the required exigency. The police had probable cause to believe the defendant guilty of murder. They had strong reason to believe he was armed since the Plympton police department had only recently returned to the defendant the two rifles and shotgun which he had surrendered earlier. In addition, they had been told by Folsom that the defendant had hidden Kidd's .357 magnum revolver behind his home and it was possible that the defendant had later retrieved this weapon. The story of the previous day's events which Folsom had related indicated to the police that the defendant liked to carry guns with him, had a violent temper, and threatened others, including his own mother, with guns when crossed. In fact, the defendant's mother had called the Plympton station the day before to report her fear that "someone might get hurt" because the defendant had a gun. The police knew from Officer Stephen Brown that the defendant had been home at the time of the original fire emergency and had bolted up the stairs to his apartment when he saw Officer Brown come into the luncheonette in connection with the smoke

fire. The police thus had reason to believe that the events of the previous day were very much on the defendant's mind and that he might, at any moment, decide that he was increasing his risk of being apprehended by staying at home and resolve to flee. Certainly there was danger that the defendant would learn of the discovery of Kidd's body or the fact that Folsom had gone to the police, thus greatly increasing his incentive to escape and making an immediate arrest desirable. See *Commonwealth* v. *Boswell,* 374 Mass. 263, 271 (1978) (warrantless arrest justified by risk that the defendant would learn of codefendant's arrest and escape if not immediately apprehended).

We conclude further that the Commonwealth has shown, as required by our cases, that it was impracticable for the police to obtain a warrant. *Commonwealth* v. *Saia,* 372 Mass. 53, 56-57 (1977). *Commonwealth* v. *Forde,* 367 Mass. 798, 800 (1975). The fact that the police were able to procure search warrants after the arrest does not preclude a finding that the warrantless arrest was valid. See *Commonwealth* v. *DiSanto,* 8 Mass. App. Ct. 694, 700-703 (1979) (warrantless entry to arrest upheld even though police were able to obtain search warrant within one hour of entry). The defendant was arrested on Sunday of a holiday weekend. The information available to the police suggested that they were dealing with an armed man easily provoked to violence under normal circumstances and now particularly unnerved by the sight of police officers. The defendant himself had attested to his violent nature by surrendering three weapons to the police some weeks earlier. Under these circumstances the police could reasonably fear that the delay involved in procuring a warrant increased the risk of violence. That some delay could be anticipated is indicated by the fact that the police had to go to an assistant clerk's home and then to the courthouse in order to obtain warrants to search the defendant's home after the arrest. The police were understandably anxious to arrest the defendant in a way that would minimize the risk of violence. There was a need for quick action. Even though the police

could have "staked out" the apartment while an arrest warrant was obtained, we have held before that the failure to follow this procedure is not proof of unreasonable police conduct. *Commonwealth* v. *Young*, 382 Mass. 448, 460 (1981).[3] Furthermore, a stakeout could easily have been dangerous under the circumstances of this case. The defendant had showed signs of panic when he saw Officer Brown earlier in the day. If a stakeout had been attempted and the defendant had caught sight of a policeman, a violent confrontation could have ensued which would have endangered the patrons of the luncheonette and the children in the neighboring house as well as the police officers and possibly the defendant's family. The police were not required to run these risks. "The Fourth Amendment does not require police officers to delay . . . if to do so would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary* v. *Hayden*, 387 U.S. 294, 298-299 (1967).

Finally, we find no basis for condemning the procedures used here as unreasonable. The police adopted methods calculated to ensure a peaceable daytime arrest. The method of arrest which was used minimized the danger to all concerned and the police had sound reasons for handling the situation as one with the potential for violence. It is undisputed that there were sixteen to twenty customers in the luncheonette and five children in the yard of a nearby residence when the defendant was arrested. In addition, the police knew the defendant lived with his wife and baby and were afraid their lives would be endangered by an attempt to arrest the defendant inside his apartment. Under these circumstances, we hold that the police acted reasonably and under exigent circumstances.[4]

---

[3] We have also pointed out that a "stakeout," particularly where it might be a lengthy one, may be much more intrusive than an approach to a suspect's door. *Commonwealth* v. *Boswell*, 374 Mass. 263, 270 (1978). Furthermore, in maintaining an effective stakeout, the police run the risk of attracting notice from passersby who might then be endangered by any violent confrontation that ensued.

[4] Our recent decision in *Commonwealth* v. *Huffman, ante* 122 (1982), is not to the contrary. In *Huffman* police officers had watched occupants

2. *Confession as "fruit" of an allegedly unlawful arrest.*
We note briefly that, even if the arrest here were unlawful, the defendant's confession was not a "fruit" of the arrest in a constitutional sense and suppression would, therefore, not be required. The crucial question with respect to this issue is, of course, "whether . . . the evidence . . . has been come at by exploitation of . . . [the primary] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963) (citation omitted). The giving of Miranda warnings alone will not make the inculpatory statements sufficiently an act of free will to purge the primary taint. *Brown* v. *Illinois*, 422 U.S. 590, 602 (1975). Rather, the question whether a confession is the product of free will must be resolved by looking at several factors including (1) Miranda warnings, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *Id.* at 603-604.

In this case the defendant was given Miranda warnings at least twice before he made his confession at the Abington police station. He was arrested shortly after 1 P.M. and the tape-recorded interrogation began at 2:50 P.M. This time interval compares favorably to those in *Commonwealth* v. *Sylvia*, 380 Mass. 180, 184 (1980) (one and one-half hours) and *Commonwealth* v. *Fielding*, 371 Mass. 97, 114 (1976) (three hours), in both of which we found the confessions properly admitted even though the arrests were improper. The record discloses no "insistent questioning or other pres-

---

of the defendant's apartment bagging a "green herb" from a building across the street and then from the hallway outside the apartment through a partially open door. They entered the apartment and effected an arrest and a seizure of what proved to be marihuana without first obtaining arrest and search warrants. We held that the police entry was not justified by exigent circumstances. However, *Huffman* involved neither an armed defendant nor a crime of violence. Nor was any evidence presented to show a possibility that the defendant might flee. In short, no risks comparable to those outlined above would have resulted from a delay to obtain warrants in *Huffman*.

sure or any brutality on the part of the police." *Common-wealth* v. *Fielding, supra* at 112. During the early part of the interrogation the defendant appears calm and firmly denies killing Kevin Kidd. It is after he has listened to the statement Folsom gave to the police that he confesses. The confession was a direct product of this intervening circumstance and not of the arrest itself.

3. *Further arguments relating to admissibility of the confession.*

The defendant claims that the trial judge erred in denying his motion to suppress his confession[5] arguing (a) that he was "deprive[d] . . . of the assistance of his family thereby depriving him [of] access of counsel," (b) that the interrogating officers "failed to scrupulously honor the defendant's request to terminate the questioning," (c) that "the Commonwealth failed to show that the defendant was advised of his right to make a telephone call" under G. L. c. 276, § 33A, and (d) that his waiver of his Miranda rights was, under the circumstances, constitutionally defective. Only the first of these claims was both raised at trial and properly preserved as an issue on appeal. The claims based on an allegedly improper failure to terminate questioning and a violation of G. L. c. 276, § 33A, are raised in this court for the first time. The invalid waiver claim was raised in the defendant's motion to suppress the confession but was waived by defense counsel at the hearing on the motion. Because of this action of defense counsel, the prosecutor thereafter limited his questions to Detective Joyce to those that would establish the confession as free of the taint of the arrest. We, therefore, consider the defendant's second, third, and fourth contentions only by virtue of our limited power under G. L. c. 278, § 33E. Our review will be limited to ascertaining "whether, absent our intervention, there exists a substantial risk that a miscarriage of

---

[5] Although the defendant's motion also sought suppression of certain tangible evidence, his arguments in this court relate solely to the admission of his confession.

justice will occur." *Commonwealth* v. *Monsen*, 377 Mass. 245, 246 (1979). See also *Commonwealth* v. *Callahan*, 380 Mass. 821, 822 (1980); *Commonwealth* v. *Hooks*, 375 Mass. 284, 294-295 (1978).

We summarize the evidence adduced at the hearing on the motion to suppress with respect to the defendant's confession. After his arrest the defendant was taken to the Abington police station. He was given Miranda warnings. From 2:50 P.M. to 3:55 P.M. he was interviewed in a room at the station. The interview was conducted primarily by Detective Joyce and was tape recorded in its entirety. Sergeants James Healey and Thomas Bowden were also present. The defendant was eighteen years old,[6] married, and had one child. Detective Joyce testified that the defendant appeared "quite calm" at the beginning of the interview. After he opened the interview, Detective Joyce read the defendant his Miranda rights (the defendant interjected that he had already heard them once), asking as to each whether the defendant understood. The defendant indicated that he understood each right. In response to the final question, "Now, knowing these things, are you willing to talk with us at this time?", the defendant responded, "Certainly." The substance of the interview was not brought out during the hearing on the motion.

The defendant's brother, Gary A. Bradshaw, who operated the general store and luncheonette above which the defendant lived, was present at the defendant's arrest. He discovered that the defendant was being taken to the Abington police station. The brother testified that about one hour and twenty minutes after the arrest, around 2:30 P.M., he and his wife went to the police station, asked where the defendant was, and were told by the desk officer that he was being questioned. The desk officer said he would have to speak with a superior about the brother's seeing the defendant. The brother then spoke with another officer, ask-

---

[6] It appears from the tape of the interview itself that the defendant was eighteen years and nine months old at the time of his arrest.

ing him what the defendant was charged with, and whether
he had had a chance to call a lawyer or to call someone in
the family to get a lawyer.  The officer responded that he
had given the defendant his rights but did not know
whether he had called a lawyer and would check with a
superior.  Somewhat later, a third officer appeared, told
the brother that police officers were talking with the de-
fendant, and that the brother could see him soon.  He
returned shortly thereafter, at about 3:30 P.M., to say that
the defendant had made a statement and that the brother
could see the defendant after 6:30 P.M.

While he was at the police station the defendant's brother
called their father to ask if he had reached an attorney.  At
some point they reached an attorney[7] who met them at the
station at 6:30 P.M. and spoke with the defendant.

Detective Joyce testified that while he was interviewing
the defendant, Sergeant Healey informed him that the de-
fendant's brother was at the station and wished to see the
defendant.  Detective Joyce testified that he was not aware
during the interview that the defendant's brother and father
were seeking an attorney for the defendant.  There was, in
fact, no testimony that any officer at the station was told
that an attorney was being sought.  It is undisputed that the
defendant himself was not told that his brother was at the
station until some time after the interview was concluded.

The tape of the interview itself, which was played twice
at a voir dire and once at trial, reveals additional facts.  At
the conclusion of the interview, Detective Joyce questioned
the defendant as to the voluntariness of the confession he
had just made.  In response to questions, the defendant said
no promises had been made to him and no one had threat-
ened him, and he affirmed that he had been given Miranda
warnings before making his statement.  The defendant
asserted that he had been "threatened" to make the state-

---

[7] It is not clear from the defendant's brother's testimony how many calls
were made from the station by the brother and his wife and how many
were made by the father from his home.  Attempts were made to contact
several different lawyers.

ment only "[b]y my own self" and that "nobody's made nothing to me. I stated on my own." During the interview the defendant never asked to see his brother and never requested an attorney. He did ask to see his wife toward the end of the hour. Shortly after the interview was concluded the retained attorney called the station, told a police officer that he was representing the defendant, and asked that the police thereafter refrain from talking to the defendant. The police complied with this request.

The testimony with respect to the alleged deprivation of the defendant's right to a telephone call was very limited since this claim was not asserted as a ground for suppression of the confession. At neither the suppression hearing nor at trial was any police officer asked specifically whether the defendant was informed of his statutory right to a telephone call. At trial defense counsel asked the defendant, "Did you make any phone calls while you were [at the station]?" and the defendant responded, "I asked them to, but they told me after the interview I could make a call." The defendant was not cross-examined on this point.

The portion of the transcript to which the defendant's claim that his request to terminate questioning was ignored reads as follows:

> Q: "And then what did you do? Huh?"
> A : "I pulled everything out of the trunk."
> Q: "Huh?"
> A : "I pulled the blanket out of the trunk."
> Q: "Yeah?"
> A : "I put it over - - - - - and I cut myself."
> Q: *"Yeah. Could you look over this way and talk?"*
> A : *"I don't want to talk."*
> Q: *"And then what?"*
> A : "And then I said — think of something. I don't want to go to jail. I goes — if I go down there and tell them it's self-defense, they ain't gonna believe me anyhow. They'll put me away anyways." (Emphasis supplied.)

The context in which this exchange occurs is discussed in more detail below.

a. *Deprivation of family and counsel.* The reasoning underlying this argument seems to be that the police deprived the defendant of access to his family, the family were seeking to retain counsel for the defendant, and, therefore, the defendant was deprived of the assistance of counsel. We find no reason to suppress the confession on such a theory.

The defendant was given Miranda warnings when he was first brought to the station and again at the beginning of the taped interview. He indicated that he understood that he had a right to an attorney and that if necessary, an attorney would be appointed. After being advised of his rights, he agreed to talk with the police. Since the defendant did not question the voluntariness of his waiver of these rights at the suppression hearing, we assume for the moment that there was a valid initial waiver of Miranda rights.

It is clear that a defendant must not only be advised of his Miranda rights at the outset of an interrogation but must also be afforded a continuing opportunity to exercise those rights. *Commonwealth* v. *McKenna,* 355 Mass. 313, 324 (1969). In this case, however, there is no claim that the defendant affirmatively requested an attorney at any point during the questioning and that his request was denied. Contrast *Commonwealth* v. *Watkins,* 375 Mass. 472 (1978) (statements properly suppressed when made by the defendant after he asked for an attorney and was pressed into talking further).

Furthermore, there is no evidence that the police prevented the defendant from conferring with an attorney already retained by him or his family. A failure of the police to inform a defendant that his lawyer is present and wants to be with his client during questioning would render a previous waiver of the right to counsel inoperative and constitute a denial of a continuing opportunity to exercise the right. *Commonwealth* v. *McKenna, supra.* Here, though, the defendant introduced no evidence that would justify suppression on this ground. In fact, Detective Joyce testified at

a voir dire during the trial that an attorney first called the station after the interview was concluded and that the police thereafter refrained from any further questioning of the defendant upon request of the attorney. There was no testimony that any officer in the station was told an attorney was being sought for the defendant by his family. The defendant's reliance on *Commonwealth* v. *Mahnke,* 368 Mass. 662 (1975), cert. denied, 425 U.S. 959 (1976), is thus misplaced. In *Mahnke* the police officers who interrogated the defendant knew that the defendant had had counsel for months and had actually interrogated the defendant about the crime with which he was charged in the presence of his attorney on a previous occasion. In addition, Mahnke's attorney had attempted to reach one of the police officers on the case several times before the interview was conducted but the officer failed to return the calls. In these circumstances we agreed with the trial judge that the police had engaged in "a course of conduct calculated to circumvent . . . [the defendant's] constitutional rights to have the benefit, aid, and counsel of his attorney." *Id.* at 692. No such deliberate deprivation of constitutional rights has been shown here.

The defendant seeks in essence to cast his brother in the role of an attorney for purposes of his right to counsel. We find no support in our cases for such a proposition. There is no constitutional right to the presence of family.

The defendant's right to counsel was not impaired by the failure of the police to tell the defendant his brother was present. In addition, since the defendant never asked to see his brother, it is unclear how the brother's desire to see the defendant could affect the voluntariness of the defendant's waiver of his rights.

b. *Request to terminate questioning.* The defendant argues that the interrogating officers failed to "scrupulously honor" his right to cut off questioning. *Miranda* v. *Arizona,* 384 U.S. 436, 474, 479 (1966). This contention is based on the exchange set out above in which the defendant says, "I don't want to talk." We have listened to the record-

ing of the interview at the police station and conclude that the defendant's rights were not violated.

It is clear that a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place. *Commonwealth* v. *Brant*, 380 Mass. 876, 884 (1980). *Commonwealth* v. *Jackson*, 377 Mass. 319, 325-326 (1979). If a defendant who has initially waived his right to remain silent wishes later to cut off questioning, however, he must "indicat[e] in [some] manner" that he is invoking the right he previously waived. *Miranda* v. *Arizona, supra* at 473-474.

Our review of both the tape and the transcript in this case convinces us not only that the officers did not hear the defendant's alleged assertion of his right but also that the defendant's subsequent conduct indicates that the remark was not intended as an assertion of his right to stop the questioning. In the relevant portion of the tape recording the defendant is crying and his responses have become difficult to hear. The incomplete transcription of the answer the defendant gives just before he says, "I don't want to talk," indicates that the defendant's voice had dropped. The defendant says, "I don't want to talk," quite softly and at the same time as Detective Joyce is requesting him to "look over this way and talk" another officer is suggesting he "slide up here a minute" (presumably closer to the microphone). In addition, a telephone in the room rings just after the defendant's comment. These circumstances suggest that Detective Joyce and the other officer did not hear the defendant's remark. Contrast *Commonwealth* v. *Brant*, 380 Mass. 876, 880 (1980) (defendant answered, "No," to Miranda question whether he was willing to proceed without an attorney and police wrote answer next to question on written form).

In any case, the words spoken by the defendant at this point in the interview, when taken in context, are insufficient to establish that the defendant was asserting his right to halt further questioning. Without any more encouragement than the question, "And then what?" and without any apparent hesitation, the defendant continued speaking.

The course of that portion of the interview which follows the defendant's comment contains additional indication of a desire to talk further rather than a desire to cease talking. On at least three occasions Detective Joyce starts to conclude the interview and the defendant interrupts him and talks further. In short, the impression that emerges from the interview is that of a man who wants to talk, not one who is being forced to talk.

We find no support in our cases for a holding that, under these circumstances, the police failed to honor a request to terminate questioning. The police response to the defendant's comment reflects neither a subtle attempt to turn him "toward an inculpatory statement," *Commonwealth* v. *Brant, supra* at 886, nor a "deliberate decision . . . to interrogate [the defendant] in spite of his desire to remain silent," *Commonwealth* v. *Jackson, supra* at 326. We decline to exercise our power under G. L. c. 278, § 33E, on this ground.

c. *Denial of right to telephone call under G. L. c. 276, § 33A.* The defendant claims that he was never informed of his right under G. L. c. 276, § 33A, to use the telephone at the station within one hour of his arrival for the purpose of calling family or an attorney. The only evidence cited in support of this claim is the defendant's own testimony, late in the trial, that he asked to make a telephone call and was told he could do so after the interview. In his brief the defendant himself describes this testimony as only supporting an "inference" that he was not advised of his statutory right.

We have repeatedly emphasized the importance of the right created by G. L. c. 276, 33A. See, e.g., *Commonwealth* v. *Meehan,* 377 Mass. 552, 567 (1979), cert. dismissed, 445 U.S. 39 (1980); *Commonwealth* v. *Alicea,* 376 Mass. 506, 511 n.11 (1978). However, in the only case in which we ordered suppression of an identification solely because of a violation of this statute, a wilful violation was made out. *Commonwealth* v. *Jones,* 362 Mass. 497, 503 (1972). We decline to find an intentional deprivation of the right guaranteed by G. L. c. 276, § 33A, on this record.

d. *Validity of the defendant's waiver of his Miranda rights.* The defendant appears to argue that the police conduct overall, when viewed in light of the manner in which the defendant's arrest was effectuated, rendered his waiver of his rights constitutionally invalid. The defendant emphasizes that he was interrogated for one hour by an experienced police officer in the presence of two other officers, that he had recently been arrested by a number of armed officers, that he had no contact with his family between the arrest and the questioning, that he was not told that his brother was at the station, that he was told toward the beginning of the questioning that Folsom was at the station and willing to repeat to the defendant the account he had given to the police, and, finally, that the police violated the defendant's right to terminate questioning.

Where a defendant, without the presence of counsel, makes statements to the police during a custodial interrogation, the State bears a heavy burden of proving that there was a knowing, intelligent, and voluntary waiver of Miranda rights. *Commonwealth* v. *Garcia*, 379 Mass. 422, 428 (1980). *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966). A reviewing court should consider the totality of the circumstances leading up to the waiver, including the conduct and characteristics of the accused and the manner in which the interrogation itself is conducted. *Commonwealth* v. *Hooks*, 375 Mass. 284, 289 (1978). Every reasonable presumption against waiver will be indulged. *Id.* at 288.

We conclude that no inference of involuntary waiver can be drawn from the record in this case. There is no claim that the defendant was incapable of knowingly waiving his rights due to the effects of alcohol or drugs. Contrast *Commonwealth* v. *Hosey*, 368 Mass. 571, 578-579 (1975). Neither is there any hint that the defendant was mentally retarded or suffered from some mental disability which would make expert testimony on his capacity to waive his rights desirable. Contrast *Commonwealth* v. *Daniels*, 366 Mass. 601 (1975). On the contrary, the impression of the defendant that emerges from the tape is that of a responsive, reasonably

articulate man who can recount a series of events in an orderly fashion. There is no evidence of coercion, threats, or animosity on the part of the officers present during the questioning. The defendant had been given Miranda warnings twice before the questioning began. Detective Joyce testified that the defendant appeared calm. Neither the tape nor the other evidence supports an inference that the manner of arrest so unnerved the defendant that he was unable to understand or waive his rights. Neither does the length of the interview (one hour) appear so excessive as to raise a suspicion that the police were trying to wear down the defendant's inner resources. Compare *Commonwealth* v. *Davis*, 380 Mass. 1 (1980) (two and one-half hour interview; waiver found voluntary). Further, there has been no showing that the failure of the defendant to have contact with his family between the arrest and the interview was of particular concern to him. In sum, we find no evidence that the defendant's waiver here could be struck down as involuntary. Relief under G. L. c. 278, § 33E, is not warranted on this ground.

4. *Evidence of prior misconduct.*

The defendant contends that the judge erred in permitting the introduction of evidence of other prior misconduct by the defendant on the day of the murder. The defendant points in particular to testimony that he stole tools from Alphonse and cut hoses on one of Alphonse's trucks; that he assaulted Santiano and threatened to kill him; that he threatened Alphonse; and that he threatened his mother with an unloaded gun. The judge found the evidence relevant to establish a pattern of conduct during the day and relevant to the issue of premeditation. We assume that a valid continuing objection to all of this evidence was made by the defendant, although it is questionable whether the record supports this assumption.[8]

---

[8] After Folsom testified that the defendant cut the hoses on one of Alphonse's trucks, the defendant objected and, during the ensuing bench conference, gave as his reasons for objecting that he saw no relevancy or

Evidence of other crimes is clearly not admissible for the purpose of proving bad character or a propensity to commit crimes. *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372 (1978). *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-816 (1973). If, however, such evidence is relevant for some other purpose, it is not rendered inadmissible merely because it indicates the possible commission of another offense. *Commonwealth* v. *Young*, 382 Mass. 448, 462-463 (1981). *Commonwealth* v. *Hoffer, supra.*

The prosecution's theory was essentially that the defendant killed Kidd because of his frustration over Kidd's request that the defendant return the money Folsom had given him for the car so that Folsom in turn could repay Kidd. In support of this theory, the prosecution sought to cast the defendant's activities on the day of the murder as a desperate search for money — a day spent selling assets (the car to Folsom), collecting debts by any means possible (stealing tools from Alphonse, vandalizing his truck, and threatening him), reacting violently to any tampering with his own property (threatening Santiano over the missing tires), and, finally, venting his mounting frustration by killing Kidd over the return of most of the money he had managed to collect.

In the context of this case the judge did not abuse his discretion in admitting the evidence of the defendant's activities that day prior to the murder. The evidence was relevant to show intent or motive, *Commonwealth* v. *Young, supra* at 463, and was also "inextricably intertwined with the description of events on the [day] of the killing," *Commonwealth* v. *Hoffer, supra* at 373. Without the challenged evidence the killing could have appeared to the jury as an essentially inexplicable act of violence. The prosecution was entitled to present as full a picture as possible of

materiality "at this time" and "unless my brother intends to tie it up to this case." The judge noted the objection and defense counsel concluded, "Very well. I'm glad we got that on the record. At least that clears it up and it makes it easier for me as we go along." He did not object specifically to any of the subsequent bad acts evidence.

the events surrounding the incident itself. *Commonwealth v. Chalifoux, supra* at 816.

The prejudice likely to be generated by the admission of this evidence did not so outweigh its probative value that it was error to admit it. The evidence of other misconduct was not excludable merely because some of it (threatening others with a gun) resembled the crime with which the defendant was charged. *Commonwealth v. Sperrazza*, 379 Mass. 166, 168-169 (1979). *Commonwealth v. Doyle*, 5 Mass. App. Ct. 544, 548 (1977). In addition, the defendant himself admitted to assaultive and destructive behavior, thereby introducing evidence similar to that to which he is now objecting. Furthermore, the defendant requested no limiting instruction to protect himself against any prejudice he perceived, either when the other crimes evidence was introduced or when the charge was given. In this situation, the judge was not required on his own to instruct the jury as to the purpose for which the evidence was offered. *Commonwealth v. Monsen*, 377 Mass. 245, 252 (1979). The admission of this evidence was not error.

5. *Photographs.*

The defendant objects to the admission in evidence of three black and white photographs and one color photograph depicting the body of the victim, claiming that the photographs were prejudicial and lacked probative value.

We find no merit in this contention. The admissibility of photographic evidence rests almost entirely in the discretion of the judge. *Commonwealth v. Bastarache*, 382 Mass. 86, 105-106 (1980). It is a "rare instance[ ] in which the probative value of [such] evidence is [so] overwhelmed by its inflammatory potential" that a reversal would be warranted. *Commonwealth v. Repoza*, 382 Mass. 119, 128 (1980). In this case, the judge carefully reviewed the photographs offered by the prosecution and finally allowed only the least offensive to be introduced as probative of the cause of death and the nature of the injury. He excluded photographs showing alterations caused by autopsy procedures. See *Commonwealth v. Bastarache, supra.* When the photo-

graphs were given to the jury, he gave careful cautionary instructions as to the use to which they could be put. There was no abuse of the judge's discretion in this area.

6. *Prosecutorial misconduct in closing argument: objection made.*

The defendant urges us to reverse his conviction because of certain improprieties in the prosecutor's closing argument. The defendant points to a number of allegedly improper lines of argument. He objected to certain remarks but failed to object to others. We discuss first those objections which were presented to the judge and then those objections raised for the first time on appeal. As to the latter, of course, we consider only whether reversal is required to prevent a substantial risk of a miscarriage of justice. G. L. c. 278, § 33E. *Commonwealth* v. *Daigle,* 379 Mass. 541, 549 (1980). *Commonwealth* v. *Monsen,* 377 Mass. 245, 246 (1979).

a. *Self-defense.* The prosecutor suggested in his argument that the defendant had offered two inconsistent theories of defense, (1) the defendant did not kill Kidd and (2) that it was self-defense, and that he did this in order to keep his options open until he saw how his witnesses "hold up." Defense counsel objected to these comments at the close of the prosecutor's argument.

While the reference to witnesses "hold[ing] up" was certainly unnecessary, these comments as a whole fall within the requirement that proper argument be based on the evidence and the fair inferences to be drawn from the evidence. *Commonwealth* v. *Burke,* 373 Mass. 569, 575 (1977). *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). The issue of self-defense was raised by the defendant's recorded confession, *Commonwealth* v. *Fluker,* 377 Mass. 123, 127 (1979), and the judge gave an instruction on self-defense.[9] No objection was

---

[9] Defense counsel stated at one point that he would have some "requests outside the usual requests" for charges but the record does not reveal whether the charge on self-defense was one of those he requested.

made to the charge or to the portions of the confession in which the defendant, in effect, claimed self-defense and expressed a hope that he would be convicted of manslaughter only. In addition, defense counsel's cross-examination of Folsom hinted at self-defense. Defense counsel repeatedly asked Folsom whether he had told the defendant before the shooting that Kidd was armed and "means business" and had threatened Folsom at Folsom's apartment. An inference could be drawn from this testimony that the defendant, if he did shoot Kidd, acted in self-defense. In sum, defense counsel made no effort to remove the issue from the trial.

We have often stated that defense trial tactics are not immune from comment in a prosecutor's final argument provided the comment is based on evidence heard by the jury. *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 401 (1975). *Commonwealth* v. *Dunker*, 363 Mass. 792, 799 (1973), denial of habeas corpus aff'd sub nom. *Dunker* v. *Vinzant*, 505 F.2d 503 (1st Cir. 1974).

We have reviewed the relevant portions of the transcript and find that the basic suggestion of a dual defense finds support in the evidence. *Commonwealth* v. *McColl*, 375 Mass. 316, 324-325 (1978). As in *Commonwealth* v. *Dunker, supra*, it may very well have been the self-defense issue which led the jury to find the defendant guilty of second, and not first, degree murder. *Id.* at 800. A reversal is not warranted on this ground.

b. *Testimony of Avery and McLellan.* During the course of the defense presentation, the defendant called James Avery and Thomas McLellan to testify that approximately one week before Kidd was murdered they met Folsom at a local park and that Folsom accused first them and then Kidd of stealing drugs from him. The prosecutor initially objected to this testimony. When the judge then requested an offer of proof, defense counsel claimed Avery and McLellan would testify that they heard Folsom threaten to "get" Kidd. The judge allowed defense counsel to pursue this line of questioning. Avery, on the stand, did not remember Kidd's name coming up at all and McLellan, while

he remembered Folsom's naming Kidd as the probable thief, could recall no threats. Defense counsel attempted to refresh the recollections of both men by reminding them that they had discussed the incident with him. He clearly implied that during the earlier interview the men had mentioned hearing Folsom threaten to get Kidd. In his closing argument, the prosecutor suggested that Avery, at trial, "came up lame, . . . wouldn't go the route, . . . wouldn't lie" and that McLellan "wasn't aware that the signals had been changed" and therefore "[went] along with the original story." He suggested the jury "dismiss" the two men's testimony. In his own closing argument, defense counsel referred to these two witnesses only to set up a contrast between the Avery-McLellan-Folsom group, who were "bum[s], unemployed, doing dope, dealing dope" and the defendant, who was characterized as "a working stiff" with a wife, a baby, and an apartment.

Defense counsel objected that the prosecutor's comments in his closing argument suggested to the jury that defense counsel was involved in suborning perjury. Viewed in context, the comments do not amount to prejudicial error. The jury had just heard defense counsel himself suggest that Avery and McLellan were unreliable, untrustworthy characters. In all likelihood, the prosecutor's comments merely suggested to the jury that Avery and McLellan were changing their story. Defense counsel himself is responsible for any hint that he was involved in this shift since his questions repeatedly brought before the jury the fact that he had interviewed these two witnesses before trial. In addition, without alluding specifically to these comments and thereby perhaps giving them undue weight, the judge instructed the jury to ignore any uncomplimentary references by one counsel to the other. We have refused to find reversible error in more egregious situations than this. See, e.g., *Commonwealth* v. *McColl*, 375 Mass. 316, 324-325 (1978) (prosecutor outlines imaginary conversation between defense counsel and defendant in which defense counsel suggests they construct an insanity defense). We conclude that the

defendant was not seriously prejudiced by the prosecutor's comments on this essentially collateral matter. Cf. *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 316 (1973).

c. *Reference to excluded testimony.* The defendant made his confession after the statement given to the police by Folsom was read to him. The judge excluded the portion of the tape recording in which Folsom's statement is read. When the tape was played at trial, the judge halted the tape at Folsom's statement and explained to the jury that such a statement had been read to the defendant but was being excluded as hearsay. He specifically informed the jury that they could take into consideration the fact that a statement was read. In his closing argument, the prosecutor suggested that if there had been inconsistencies between Folsom's statement to the police and his testimony at trial, defense counsel "would have been all over him [Folsom] like a clean suit." Defense counsel objected to this as improper comment on excluded evidence.

The rule is clear that "[n]o attorney shall refer in closing argument to evidence which has been excluded . . . ." *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977). While Folsom's police statement was excluded, its existence and its effect upon the defendant were facts put before the jury. We need not decide this question, however, because we find that, even if improper, the comment does not constitute prejudice which warrants reversal. Folsom was the chief witness for the prosecution. He was subjected to a lengthy cross-examination by defense counsel particularly as to the events immediately surrounding the killing. At several points during cross-examination, defense counsel implied that Folsom had changed his story and he repeatedly suggested as much in his own closing argument. Under these circumstances the jury could hardly have been unaware of defense counsel's interest in discovering and bringing to their attention inconsistencies in Folsom's testimony. We are persuaded that "the information conveyed . . . [by the prosecutor's comment] could have had but little practical effect" on the jury. *Commonwealth* v. *Roberts*, 378 Mass. 116, 123 (1979).

7. *Prosecutorial misconduct in closing argument*: *no objection made.*

We review briefly, under the "miscarriage of justice" standard, those instances of alleged prosecutorial misconduct as to which no objection was made or curative instruction requested.

a. *Defense counsel's "illogical rhetoric."* The prosecutor said that defense counsel was engaged in "rhetoric, illogical rhetoric" in suggesting in his final argument that the witnesses Avery and McLellan were, like Folsom, "bums" and "dope dealers." These words were clearly not directed, as the defendant argues in his brief, at "the defendant's entire defense." They were in fact a proper response to defense counsel's final argument, in which he urged the jury to believe that Folsom, and not the defendant, killed Kidd because Folsom was a "dope-dealing bum" and therefore "capable of blowing somebody away." The judge specifically instructed the jury to disregard any uncomplimentary remarks exchanged by counsel.

b. *Expressions of personal belief in credibility of witness.* The defendant claims that the prosecutor was guilty several times of personally vouching for the credibility of Folsom[10] and that this enhancement of the testimony of the chief prosecution witness created a miscarriage of justice. We find the relevant comments were based on evidence developed at trial and inferences to be drawn therefrom.

c. *Pressure on witness not to testify.* The prosecutor commented that the Commonwealth put "a lot of pressure" on the witness Santiano to testify and added that the jury could infer that there was also some pressure on Santiano not to testify. An inference could easily be drawn from the evidence that Santiano would be under pressure not to testify — from his girlfriend (the defendant's sister) and other members of the defendant's family. This inference would

---

[10] Under the disciplinary rules of this court (S.J.C. Rule 3:07, DR 7-106 (C) (4), 382 Mass. 787 [1981], previously appearing at 359 Mass. 821 [1971]) a lawyer shall not "[a]ssert his personal opinion . . . as to the credibility of a witness . . . ."

be relevant to an assessment to Santiano's credibility. The prosecutor's comment was not improper.[11]

d. *Argument that some evidence was irrelevant.* The prosecutor commented that much of the evidence he had introduced was no longer significant by the end of the trial. The judge gave lengthy instructions on the burden of proof borne by the Commonwealth. The prosecutor's comment amounts to a statement of the obvious fact that the trial had boiled down to a duel of credibility between the defendant and Folsom.

e. *Reference to polygraph tests.* The defendant objects to the prosecutor's statement that "the greatest, . . . bar none, polygraph tests or anything else, the greatest truth depicting device is cross examination." This statement was merely a representation that cross-examination was a good way to test a witness's credibility. We fail to see how the defendant was prejudiced by this remark.

f. *Use of evidence of prior misconduct.* The defendant objects to the prosecutor's characterization of a not guilty verdict as a "badge of good citizenship" for the defendant and to the use made in the final argument of the defendant's other misconduct on the day of the murder. The prosecutor's suggestions as to what conclusions could be drawn from the defendant's numerous oral and physical threats were strong. On the other hand, the bulk of defense counsel's own closing argument was devoted to an effort to set up a contrast between the characters of Folsom and the defendant and then encourage the jury to acquit the defendant and "convict" Folsom based on that contrast.

Certain of the prosecutor's comments came very close to injecting into the trial "elements of irrationality . . . [which] can only serve to make it less likely that the jury will return a verdict based on fair, calm consideration of the evidence." *Commonwealth* v. *Shelley*, 374 Mass. 466, 470 (1978). As to these, however, our review of the closing arguments per-

---

[11] Apparently a bench warrant was required to compel Santiano to testify. The jury were not aware of this fact.

suades us that the prosecutor was responding to similarly improper arguments by defense counsel. In an effort to narrow those situations in which the limited right to "fight fire with fire" will be recognized, we have required that the relevant prosecution comments be "directed solely toward correcting an erroneous impression created by opposing counsel." *Commonwealth* v. *Burke*, 373 Mass. 569, 576 (1977).

We have on more than one occasion requested that prosecutors seek redress from the trial judge rather than resort to retaliatory reply to an improper defense argument. *Commonwealth* v. *Burke, supra* at 576. *Commonwealth* v. *Earltop, supra* at 206 (Hennessey, J., concurring). In this case, the prosecutor made no objection at the close of defense counsel's argument and requested no curative instructions. We repeat our preference that the trial judge be given an opportunity to cure improper remarks. Here, however, most of the prosecutor's remarks were grounded in the evidence and the few extravagant remarks were responsive to equally extravagant defense tactics in final argument. The jury could be expected to take both arguments with a grain of salt. *Commonwealth* v. *Coleman*, 366 Mass. 705, 714 (1975). No substantial risk of a miscarriage of justice is created where "conflicting statements of opposing counsel, however inappropriate, probably served only to neutralize each other." *Commonwealth* v. *Daigle*, 379 Mass. 541, 549 (1980).

8. *Alleged Errors in Charge to Jury.*

The defendant argues that the trial judge committed error in various portions of his charge to the jury. He made no objection to any aspect of the charge at trial. Nevertheless, we consider his objections briefly and find no error.

a. *Instruction on malice.* It is clear that a jury instruction which shifts to the defendant any part of the burden of persuasion violates the requirement that the Commonwealth prove each element of the crime charged beyond a reasonable doubt. *Sandstrom* v. *Montana*, 442 U.S. 510, 523 (1979).

Defense counsel in the case at bar did not have the benefit of *Sandstrom* because the case was tried before that decision was rendered. Thus we consider this claim of error by the defendant despite the absence of an objection or exception at trial. *Commonwealth* v. *Lee*, 383 Mass. 507, 510-511 (1981). *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 248-250 (1980).

In reviewing jury instructions for constitutional defects we consider the charge as a whole and not merely isolated segments of the charge. *Lannon* v. *Commonwealth*, 379 Mass. 786, 791 (1980). The decisive question in this case is whether a reasonable juror could have understood the charge in a way that would unconstitutionally dilute the Commonwealth's burden of proving its entire case beyond a reasonable doubt.

We find that the charge on implied malice, viewed in context, created only a permissive inference similar to that upheld as constitutionally sufficient in *Lannon* v. *Commonwealth, supra*. As in *Lannon*, the judge here instructed the jury at length that the defendant was presumed innocent, that the Commonwealth bore the burden of proving all elements of the offense beyond a reasonable doubt, and that the defendant had no obligation to prove or disprove anything. The jury could not reasonably have interpreted the language used by the judge as creating a mandatory presumption. The judge at all times used the words "infer" or "inference" rather than the problematic "presume" or "presumption" *Commonwealth* v. *Lee*, 383 Mass. 507, 511 (1981). *Commonwealth* v. *Callahan*, 380 Mass. 821, 823-824 (1980), and cases cited. He carefully defined "inference" as a "permissible deduction from the evidence" and emphasized at numerous points that it was entirely up to the jury to find facts and decide whether to draw a permitted inference. He specifically told them that they were not required to draw any inference, adding, "I can't tell you what inferences you draw . . . . It is for you to say." The instructions did not relieve the Commonwealth of its burden to prove malice beyond a reasonable doubt.

b. *Burden of proof in general.* The defendant points to no specific defects in the instructions in this regard and cites us to no cases that support his contention that the charge on reasonable doubt and the Commonwealth's burden was improper. We thus find it unnecessary to discuss this issue in detail. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Lolos* v. *Berlin,* 338 Mass. 10, 13-14 (1958). The jury were clearly told that the burden on the Commonwealth was to prove each element of the offenses charged beyond a reasonable doubt.

c. *Instructions on choice between manslaughter and murder.* The jury were instructed that if they found the defendant guilty they should return a verdict of guilty in the highest degree proven beyond a reasonable doubt by the Commonwealth. Such an instruction was specifically approved by this court in *Commonwealth* v. *Dickerson,* 372 Mass. 783, 797 (1977). The defendant's claim of error is groundless.

d. *Self-defense.* The defendant claims that "[t]he jury were not adequately instructed in the charge on the elements of self defense as to the concept of provocation." This is a somewhat surprising argument since elsewhere in his brief the defendant objects to the prosecution's reference to self-defense in closing argument, saying that "[t]he defendant's position at all times was that he did not shoot Kidd." In any case, the defendant makes no argument and cites no authority in support of his claim of error. We have reviewed the instruction on self-defense and find no error. The language used to explain that the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense has been approved by our cases. *Commonwealth* v. *Fluker,* 377 Mass. 123, 130 n.4 (1979). *Commonwealth* v. *Rodriguez,* 370 Mass 684, 692 n.10 (1976).

We feel compelled to emphasize that no objection to the charges on burden of proof, manslaughter, or self-defense was made at trial. The defendant makes no claim that changes in the law after his case went to the jury excuse his failure to object. "His arguments are afterthoughts . . . ."

*Commonwealth* v. *Starling,* 382 Mass. 423, 427 (1981). While we have nonetheless reviewed these sketchy claims under G. L. c. 278, 33E, we reiterate that § 33E review is not intended "to afford an opportunity, from the vantage point of hindsight, to comb the trial record for interesting questions which could have been, but in fact were not, raised at the trial, or to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge." *Commonwealth* v. *Johnson,* 374 Mass. 453, 465 (1978).

9. *G. L. c. 278, § 33E.*

We have reviewed the entire case on the law and the evidence and find no occasion to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of guilt.

*Judgment affirmed.*