COMMONWEALTH *vs.* KEVIN COSTA.

Bristol. February 6, 1990. - April 9, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Joint Enterprise. Practice, Criminal*, Required finding, Assistance of counsel.

Evidence at a murder trial was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime of murder in the first degree on a theory of joint venture. [223-225]

No reason appeared on the appeal of a first degree murder conviction for the exercise of the court's power under G. L. c. 278, § 33E. [226]

INDICTMENTS found and returned in the Superior Court Department on October 8, 1987.

The cases were tried before *George Jacobs*, J.

*John R. Campbell* for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. On October 8, 1987, the defendant, Kevin Costa, was indicted for murder and kidnapping. The defendant was tried before a jury, the jury found him guilty of kidnapping and murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.[1] The defendant received the mandatory sentence of life imprisonment for the murder conviction and from eight to ten years for the kidnapping conviction, the sentences to be served concurrently.

On appeal, the defendant contends that there was insufficient evidence as a matter of law to support the conviction of

---

[1] The verdict slip indicated the jury's vote of guilty of first degree murder on both premises: deliberately premeditated malice aforethought and extreme atrocity or cruelty.

murder in the first degree and that, therefore, the trial judge erred in failing to enter, sua sponte, a required finding of not guilty. The defendant also asserts that trial counsel's failure to move for a required finding of not guilty on the murder charge amounted to ineffective assistance of counsel.[2] The defendant also seeks relief pursuant to our power under G. L. c. 278, § 33E. We affirm the convictions.

We summarize the evidence up to the time the Commonwealth rested its case.[3] At approximately 7 A.M., on October 2, 1987, Stephen Combs brought his dogs to the Freetown State Forest for a run. The dogs began to bark at what Combs initially thought was a pile of rags but which turned out to be the body of a person that had been shot several times. Combs notified the Freetown State Forest authorities who, in turn, notified the police. Local police officers and State police troopers responding to the scene discovered the victim, a white male, lying face up to the left of a dirt roadway known as Ledge Road. The victim was wearing dungarees, a T-shirt and a sweatshirt, and had a blanket wrapped around him. There were several gunshot wounds to the body. There were three gunshot wounds to the head, two to the chest and one to the groin area. The victim also had numerous abrasions on his back. The victim's body as well as his clothing, the blanket, and his beard were all partially burned. Six "410 gauge" shotgun shell casings were found on the ground in the vicinity of the body. There were several shoe impressions or sneaker impressions around the area of the body as well as tire tread impressions. It appeared that a vehicle had been parked near the victim's feet and that when the vehicle left the area, it had backed up, turned to the right, drove around the body and continued down Ledge Road into the forest. The two front tires as well as the right

---

[2]Trial counsel does not represent the defendant on appeal. The defendant does not challenge the sufficiency of the evidence as it pertains to the kidnapping conviction.

[3]The Commonwealth's position as to proof did not deteriorate between the time the Commonwealth rested its case and the close of all the evidence. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976).

rear tire of the vehicle were of a similar tread pattern while the left rear tire was of a different tread pattern.

Testimony revealed that the victim, a drifter, had met Patricia Casey four weeks prior to October 2, 1987. At that time he was living in a septic tank at M & S Concrete Company (concrete company) about one and one-half blocks from Patricia Casey's residence at 26 Mt. Hope Avenue in Fall River. Patricia Casey hired the victim to do odd jobs; she fed him, paid him $10 a day, and allowed him to live under her three-family house at 8 Mt. Hope Avenue. She had expected him to work Friday, October 2, 1987, but he did not show up for work. She checked under the front porch of 8 Mt. Hope Avenue and found the door open. She saw some of the victim's belongings but she could not locate the victim. The next day, she read in the newspaper that a body had been found in Freetown. Casey then called the Freetown police department and gave them a description which matched that of the victim, Edward Cereto.

On Sunday night, October 4, 1987, at approximately 7 P.M., Bruce Frank and Patricia Casey's nephew, Don Casey, visited her. During this visit, Fall River Police Officer Robert Aguiar and State Trooper Deborah Bruce arrived. They both spoke briefly with Frank. Frank then left with Officers Aguiar and Bruce. They went to an adjacent yard where Frank directed them to a woodpile. Under the boards in the woodpile was a 410 gauge shotgun which Frank admitted belonged to him. All six shotgun shells found near the body came from this shotgun.

At approximately 11 P.M. Sunday night, State Troopers Jose Gonsalves and Maryann Dill spoke with the defendant at the Fall River police station. Trooper Gonsalves told the defendant that he was not under arrest and then read him his Miranda rights from a State police "rights form." The defendant read the form and initialed it. When asked if he understood his rights, the defendant replied that he did and then signed the form. Troopers Gonsalves and Dill also signed the form.

Trooper Gonsalves told the defendant that they were interested in information about the victim's death, that they had spoken with several of the defendant's friends, and that they knew what had occurred on the night of October 1, 1987. The defendant asked the trooper what his friends had told them. In response, Trooper Gonsalves read aloud portions of a statement made by Steven Costa as follows: "Let's go shooting and really scare him. I'll go get my gun." "Bruce shot [the victim] in the head." "I'm not sure Bruce's first shot was to [the victim's] head." The defendant then agreed to make a statement.[4]

The defendant told the officers that he awoke late on October 1, 1987, and, therefore, was unable to go to school. After getting a haircut, he telephoned his girl friend who also had not gone to school. She accompanied him to a photography studio where he had his picture taken for his class yearbook. The defendant's girl friend "called in sick to work"; they then went to his house, but later went out. At some point her parents found her and took her home.

At around 7 P.M, the defendant and his brother, Michael Costa, took their mother's car to a package store, where Michael purchased a six-pack of beer. They then went to a local bar to look for Michael's friend, "John," who wasn't there. The defendant believed that he and his brother each had one beer. They found John at the next bar they visited. They also encountered Bruce Frank, his sister, and Steven Costa, their own cousin. Frank and his sister left to go to another bar. The Costas and John left the bar to get something to eat but changed their minds and returned to the bar only to find the restaurant section closed. The defendant thought they each consumed two more drinks at this time. They went to a restaurant into which the defendant smuggled a bottle of schnapps. There the defendant ate and drank schnapps (which was mixed with water). At about 11:30 P.M., they left the restaurant and dropped John off in Tiverton, Rhode Island.

---

[4]The voluntariness of this statement was not made an issue at trial and is not at issue on appeal.

The defendant and Michael Costa then drove Steven Costa to his car, which was parked on Atlantic Boulevard. On the way, they saw Bruce Frank walking and they picked him up. When they arrived at Steven Costa's automobile, they discovered that his left rear tire was flat. They changed the tire. At some point, Bruce Frank informed them that the victim was living in the porch area of the three-family house in which Bruce Frank lived at 8 Mt. Hope Avenue. They decided to go there to give the victim a "hard time."

On their arrival, they asked the victim questions, such as, "Who are you? What are you doing here? Are you a cop? Why are you always asking us for grass?" The defendant remembered that he hit the victim on the side of the head but could not remember where the others hit the victim at that time. Then the victim left the area and walked away through a neighbor's yard. The defendant and Michael Costa got into their mother's automobile and Bruce Frank and Steven Costa got into Steven Costa's automobile. They all drove to the concrete company because they knew that the victim had once lived in a septic tank there. The defendant, with a flashlight, looked around and inside the septic tank area for the victim. Unable to find the victim, the defendant and Michael Costa drove home. As they were parking the automobile, Bruce Frank and Steven Costa arrived in Steven Costa's automobile and said that they had located the victim. The defendant and Michael Costa then got into Steven Costa's automobile. They found the victim at the bottom of Mt. Hope Avenue. They grabbed the victim, threw him down, and each took a turn beating him. The defendant eventually threw the victim down next to a bush and told him to stay there until they were gone. At this point, Bruce Frank said, "Let's bring him to the rez and leave him there."[5]

The defendant then grabbed the victim's legs while someone else lifted his upper body. They put him in the trunk of

---

[5] The "rez" is an area in the Freetown State Forest also known as the reservation or "the ledge," which has a cliff and a body of water.

Steven Costa's automobile. On the way to the reservation, Bruce Frank stopped at his apartment to get his shotgun and ammunition. They then headed to the reservation. On the way, Frank fired the shotgun out the window of the automobile approximately three times. Each time Frank would fire the weapon, the defendant would say "Ha, ha, you're next" to the victim in the trunk. The defendant claimed that he intended to scare the victim. The defendant also claimed that he did not believe that Frank intended to shoot the victim.

While the foursome drove around the reservation, Bruce Frank indicated several times that he wanted to stop the automobile and said, "Youze think I'm kidding, youze think I'm fooling around, but I'm going to shoot him." Eventually, Frank said, "I can't wait. Let's stop here."

Steven Costa stopped the automobile on a dirt road. The defendant and Steven Costa took the victim out of the trunk and threw him to the ground. Bruce Frank then shot the victim three times. The defendant said, "You didn't shoot him, did you," and told Steven Costa to turn his car around and shine the headlights on the body. After Steven Costa turned the car's headlights on the victim, the defendant saw steam rising from the wounds to the victim's head.

Bruce Frank told Michael, Steven and Kevin Costa that they all had to shoot the victim because if one gets caught, "We all go down." Frank handed the defendant the gun. The defendant claimed that he was scared and that he did not want to end up like the victim so he took the weapon. He then shot the victim in the head. Frank took the gun from the defendant, reloaded it, gave it to Steven Costa and told him to fire. Steven Costa shot the victim in the groin. Frank took the gun from Steven Costa, reloaded it, and tried to give it to Michael Costa. Michael Costa refused to shoot the victim. The defendant then suggested that they bring the body down to the water and throw it in. However, Steven Costa did not want to transport the body in his automobile because he did not want to get blood in it. Either the defendant or Bruce Frank then suggested that they burn the body. Frank tried to ignite the body, but the defendant knew the body

would not burn without gasoline. They then got into the automobile and the defendant and his brother were taken home.[6] When the defendant got home, he passed out. The defendant stated that he had consumed as many as ten beers during the course of the evening and that he had also consumed one-half pint of schnapps.

An autopsy revealed six gunshot entrance wounds: one over the left eyebrow, one above the right eye; one in the lower part of the right ear; one to the right of and below the right nipple; one above and outside the right nipple; and one in the groin. The pathologist who performed the autopsy determined that the victim died from multiple gunshot wounds. The pathologist could not determine which wound was inflicted first. He testified that death would have been immediate if the three wounds to the head had been the only wounds. The victim's right lung had been penetrated and that alone could have been fatal had there been no other gunshot wounds. The wound to the groin was not the cause of death.

The pathologist testified that the edges of the gunshot wounds to the head were burned and charred, indicating that the barrel of the gun had been held against the skin or very close to it. The absence of pellet wounds or pellet marks around the two entrance wounds on the face also suggested that the wounds resulted from contact or near contact gun shots. The other gunshot wounds in the body appeared to have been inflicted from some distance away.

In addition, the pathologist testified that the victim's shirt and beard were burned on the right side of his body. There were burns on the right pant leg and slight burning of the underlying skin. Burns also extended from the inner arm up the neck and into the beard on the right side. The groin wound extended upward, indicating that the victim may have been lying down when it was inflicted.

---

[6]At separate trials, Bruce Frank and Steven Costa were also convicted of murder in the first degree and kidnapping. Michael Costa pleaded guilty to murder in the second degree and kidnapping.

There was testimony that, during the investigation, the pathologist stated that he thought the victim had been shot in the chest after the body had been burned.

Peggy Ann DeMoura testified that, during the early morning hours of October 2, 1987, she was awakened by the sound of automobiles in the street. She went downstairs and looked out her living room window toward the concrete company located across the street and saw two automobiles. Two people alighted from the smaller automobile and with the aid of a flashlight looked around the cement blocks.

Donna Camara testified that, at approximately 2:30 A.M. on October 2, 1987, she was in her second-floor apartment at 8 Mt. Hope Avenue. She heard people going upstairs to the third-floor apartment where Bruce Frank lived. She got up and smoked a cigarette. After a few minutes, she heard some people go outside. She looked out of her window and saw three people going to Steven Costa's car.

1. *Joint venture.* The defendant contends that (1) the trial judge erred in failing to enter, sua sponte, a required finding of not guilty on the murder indictment,[7] and (2) that he was denied effective assistance of counsel because his trial counsel failed to move for a required finding of not guilty on the murder indictment. As a basis for these contentions, the defendant asserts (1) that there was insufficient evidence admitted that would allow the jury to infer that the victim was alive when the defendant shot the victim; and (2) that there was insufficient evidence to show that he participated in a joint venture to commit murder. We hold that the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every ele-

---

[7]Massachusetts Rule of Criminal Procedure 25 (a), 378 Mass. 896 (1979), provides in pertinent part that: "The judge on motion of a defendant or on his own motion shall enter a finding of not guilty of the offense charged in an indictment or complaint or any part thereof after the evidence on either side is closed if the evidence is insufficient as a matter of law to sustain a conviction on the charge."

ment of the crime of murder in the first degree on a theory of joint venture.[8] See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Accordingly, we hold that the trial judge did not err in failing to enter a required finding of not guilty, sua sponte. We also hold that trial counsel's failure to move for a required finding of not guilty did not amount to ineffective assistance of counsel.[9] Because the evidence was sufficient for the jury to find the defendant guilty of murder in the first degree based on a theory of joint venture, we need not decide whether there was sufficient evidence that the victim was alive when the defendant shot him.

"The test [for joint venture] is whether [the] defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). Mere presence at the scene with knowledge of the planned act is insufficient alone to support a conviction on a theory of joint venture. *Commonwealth* v. *Whitehead*, 379 Mass. 640, 651 (1980). However, if one is, by agreement, in a position to

---

[8]There clearly was sufficient evidence that the murder was premeditated. See *Commonwealth* v. *Mandile*, 403 Mass. 93, 99 (1988). The evidence also warranted a finding by the jury that the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Golston*, 373 Mass. 249, 259-260 (1977), cert. denied, 434 U.S. 1039 (1978).

[9]A claim of ineffective assistance of counsel requires a "discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Because we determine that there was sufficient evidence to support a conviction of murder in the first degree on a joint venture theory, we hold that trial counsel's failure to move for a required finding of not guilty did not amount to ineffective assistance of counsel. Compare *Commonwealth* v. *Cardenuto*, 406 Mass. 450, 454 (1990) (where evidence insufficient to sustain conviction, failure to argue issue on appeal amounted to ineffective assistance).

render aid, he is an abettor even if he does not participate in the actual perpetration of the crime because his presence may encourage the perpetrator by giving him hope of immediate assistance. *Commonwealth* v. *Soares*, 377 Mass. 461, 471-472, cert. denied, 444 U.S. 881 (1979). The defendant was present when Bruce Frank shot the victim. The issue, therefore, is whether the defendant had the requisite state of mind at the time of the shooting.

A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence. Knowledge or intent, however, may be proved by inference from all the facts and circumstances developed at trial. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). In order for a joint venturer to be found guilty of the same crime as the principal actor, he must share that person's intent. *Commonwealth* v. *Cunningham*, 405 Mass. 646, 659 (1989). The jury could have reasonably inferred the requisite mental state from the circumstances and from the defendant's conduct. The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable. See *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). The defendant claimed that he did not believe that Bruce Frank intended to shoot the victim. The defendant asserted that he did not intend to kill the victim but that he only intended to scare the victim and leave him at the reservation. However, the jury were not required to believe, and plainly did not believe, these assertions. *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977).

Evidence set forth above supports the existence of a continuing effort by the defendant and his companions to harm the victim physically. See *Commonwealth* v. *Casale*, 381 Mass. 167, 175 (1980). Actions and statements that indicate consciousness of guilt on the part of the defendant are admissible and, together with other evidence, may be sufficient to prove guilt. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 52 (1975), and cases cited. The evidence was sufficient to support a conviction of murder in the first degree on a theory of joint venture.

2. *G. L. c. 278, § 33E.* The defendant seeks a reduction in the verdict from murder in the first degree to manslaughter. We have reviewed the entire case on the law and the facts and conclude that reduction of the verdict is not warranted. See *Commonwealth* v. *Luce,* 399 Mass. 479, 484 (1987) (power under G. L. c. 278, § 33E, exercised with restraint).

There was ample evidence from which the jury could have found the defendant guilty of murder in the first degree on a joint-venture theory. Moreover, the judge properly charged the jury on the elements of murder in the first degree, murder in the second degree, felony-murder, manslaughter, joint venture, the effects of intoxication, and cause of death. See *id.* at 485-486. We decline to exercise our authority under G. L. c. 278, § 33E.

*Judgments affirmed.*