COMMONWEALTH vs. COLUMBUS T. COHEN, JR.

Suffolk. March 2, 1992. - April 7, 1992.

Present: LIACOS, C J., NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Joint Enterprise. Practice, Criminal*, Conduct of prosecutor, Argument by prosecutor, Instructions to jury, Mistrial. *Constitutional Law*, Assistance of counsel. *Evidence*, Consciousness of guilt, State of mind.

Sufficient evidence was presented at the trial of two indictments for murder to support the defendant's convictions of first degree and second degree murder, respectively, on a theory that he directly committed the murders or on a theory that he was a joint venturer. [378-381]

At a murder trial, none of the alleged improprieties in the prosecutor's opening statement, cross-examination of the defendant, or closing argument, individually or collectively, warranted a mistrial or constituted reversible error. [381-389]

There was no merit to a criminal defendant's claims on appeal concerning alleged ineffective assistance of counsel with respect to the lack of any opening statement, failure to object to admissible evidence, or failure to object to the judge's correct instructions on consciousness of guilt. [389-393]

There was no error at a murder trial in the admission in evidence of certain nonhearsay testimony that was relevant to the state of police knowledge which impelled their approach to the defendant. [393-394]

INDICTMENTS found and returned in the Superior Court Department on March 11, 1986.

The cases were tried before *Robert V. Mulkern*, J.

*Esther J. Horwich* for the defendant.

*Mark D. Zanini*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant, Columbus T. Cohen, Jr., appeals from his convictions of the murder in the first degree of Kevin E. Shivers and the murder in the second degree of Johnnie Edward Shivers. The defendant contends on appeal

that: (1) the trial judge erred in denying his motion for required findings of not guilty; (2) specific instances of the prosecutor's conduct were improper; (3) defense counsel rendered ineffective assistance; and (4) testimony of witnesses improperly conveyed a third person's consciousness of the defendant's guilt.[1]

Testimony presented at trial warranted the jury's finding the following facts. On the evening of February 1, 1986, Mary Pitts, Victoria Brown, Linda Woodard, Kevin Shivers, and a friend known as "Eddie Murphy" went to the Carousel Lounge on Columbia Road in the Dorchester section of Boston. Mary Pitts was the girl friend of Kevin Shivers, and Victoria Brown was the girl friend of Kevin's brother, Johnnie Shivers. After the group found a booth to sit in, the defendant approached Victoria Brown and asked her to dance. After they danced, Victoria returned to the booth and sat down, while the defendant returned to his table.

A short time later, the defendant returned and asked Victoria for another dance, but her boy friend's brother, Kevin, strongly objected. The defendant maintained a hostile expression but remained silent while Kevin angrily confronted him. The confrontation ended with the defendant saying, "I'll be back," in a threatening manner. The defendant then walked to his table, finished his beer, and left the premises shortly thereafter.

About forty-five minutes after this confrontation, Johnnie Shivers entered the bar. The defendant returned about the same time with an unidentified companion. Johnnie Shivers, the defendant, and the other man all stood near the exit. Johnnie and Kevin Shivers then left the bar, and the defendant and his companion followed them outside.

---

[1] Although the defendant does not ask this court to exercise its power under G. L. c. 278, § 33E (1990 ed.), to review the entire record concerning his conviction of murder in the first degree, we have, nevertheless, undertaken such a review. See Commonwealth v. Hamilton, 411 Mass. 313, 315 n.2 (1991). We conclude that there is no reason to exercise our power under § 33E.

Three or four minutes later, Mary Pitts left the bar and, standing on the sidewalk, she observed the Shivers brothers, the defendant, and the defendant's companion in a group in the middle of Columbia Road. The defendant and his companion faced the Carousel Lounge while the Shivers brothers had their backs to the lounge. Mary Pitts heard three shots ring out from the area where this group was standing. Both she and Victoria Brown, who had left the bar shortly after Mary had left also heard three gunshots, and saw Johnnie Shivers, who had been shot in the back, bend over. As Johnnie bent over, both the defendant and his companion pushed him aside, as if to open a line of fire toward Kevin Shivers, who had started to run away. Two more gunshots rang out and Kevin Shivers was struck in the back as well. The defendant and his companion then fled from the scene.

As Johnnie Shivers lay on the sidewalk, he said to Mary Pitts, "I've been shot; call the ambulance, call the ambulance." As Kevin Shivers struggled to get into Mary Pitts's car, he said to her, "They shot me, too, in the back."[2] The victims died shortly thereafter as a result of their wounds. Although the two bullets recovered from the brothers were of the same caliber, color, and composition, they were too badly damaged to determine if they had been fired from the same gun. The police never recovered a murder weapon.

Several hours later, at 5 A.M., the police went to 31 Browning Avenue, the defendant's father's apartment, which is about one and one-half miles from the Carousel Lounge. While stating to the police that the defendant was not home, the defendant's father pointed to a room in the apartment and allowed the police to enter. The police then discovered the defendant in a closet in that room.

After being given the Miranda warnings, the defendant told the police officers that he had been in the Carousel Lounge earlier that evening where he had danced with a woman and where there had been an argument. The defendant

---

[2]Victoria Brown testified that Kevin said, "They got me, too; they got me, too. In my back, in my back."

told the police, however, that he left the bar and went to his mother's apartment, which was across the street from the bar, where he watched a movie, but that he had left the apartment at 10:30 P.M., and then walked home to his father's apartment. At this time, the defendant told the police that he had not returned to the Carousel Lounge that evening.[3]

1. *Motion for required findings of not guilty.* The defendant argues on appeal that the judge should have granted his motion for required findings of not guilty because there were insufficient facts to support his convictions on a theory that he directly committed the murders or on a theory that he was a joint venturer. The major thrust of the defendant's argument is that there is no direct evidence that he or his unidentified companion fired one or both of the fatal shots, and that it is possible that the gunshots could have been fired from one of the buildings across the street from the Carousel Lounge. There was no physical evidence directly linking the defendant to the shootings, and the murder weapon was never located. In reviewing the denial of a motion for required findings of not guilty, we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in the light most favorable to the Commonwealth, was sufficient to persuade a rational trier of fact of every element of the crime charged. *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979), and cases cited.

The defendant first attacks the prosecution's theory that he directly fired the fatal shots by arguing that there was insufficient evidence that he had malice aforethought and that he himself fired the fatal shots. The defendant also argues that there was insufficient evidence of deliberate premeditation in the murder of Kevin Shivers. From the evidence at trial, however, the jury would have been warranted in concluding

---

[3] At trial, the defendant denied the substance of his statement to the police, and testified instead that he had returned briefly to the bar where he was assaulted with a knife by Kevin Shivers.

that the defendant had the requisite degree of malice afore-thought. Malice aforethought includes "any intent to inflict injury on another without legal excuse or palliation." *Commonwealth* v. *Casale*, 381 Mass. 167, 171-172 (1980). After a confrontation in the bar with Kevin Shivers, the defendant warned the victim, "I'll be back," in a threatening manner. Because the defendant left the bar and later returned with an unidentified companion, with whom the defendant followed the victims from the bar, the jury were warranted in conclud-ing that the defendant returned to the bar to settle the score with and inflict injury on Kevin Shivers. The jury were also warranted in concluding that the defendant and his compan-ion confronted the victims in the street, where either the de-fendant or his companion, or both of them, shot the victims in the back. The use of a deadly weapon, such as a gun, gen-erally supports a finding of malice. *Commonwealth* v. *Rob-ertson*, 408 Mass. 747, 756 (1990).

Similarly, from the evidence at trial, the jury reasonably could have concluded that the defendant acted with deliber-ate premeditation in the murder of Kevin Shivers. After the defendant or his companion had shot Johnnie Shivers, to-gether they pushed him out of the way so that one of them could get a clear shot at the fleeing Kevin Shivers. Although there were only seconds between the shooting of Johnnie Shivers and that of Kevin Shivers, that was sufficient time for both the defendant and his unidentified companion to form an intent to kill Kevin Shivers after deliberation and reflection. See *Commonwealth* v. *Garabedian*, 399 Mass. 304, 312 (1987), and cases cited.

There is no merit to the defendant's contention that the lack of direct evidence that he fired the fatal shots required directed verdicts. The defendant relies primarily on our rea-soning in *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), in which we held that, where there are two possible assailants, the Commonwealth has the burden of proving be-yond a reasonable doubt that the defendant fired the fatal shot. *Id.* at 601. The defendant's reliance on *Salemme* is

misplaced, however, because in that case the Commonwealth abandoned a joint venture theory. *Id.*

In this case, the Commonwealth presented a theory that the defendant was guilty either directly or as a joint venturer. The evidence warranted a conclusion that the defendant was guilty either as a principal or a joint venturer, and such a determination is proper. See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 345 (1979); *Commonwealth* v. *Britt,* 358 Mass. 767, 769-770 (1971). In these circumstances, the absence of direct proof by way of an eyewitness who saw the defendant shoot the victims is not damaging to the Commonwealth's case so long as there is competent circumstantial evidence that establishes the defendant's guilt, either directly or as a joint venturer, beyond a reasonable doubt. See *Commonwealth* v. *Merola,* 405 Mass. 529, 533 (1989). An inference drawn from the circumstantial evidence in this case that the defendant or his unidentified companion, or both, fired the fatal shots need not be necessary or inescapable so long as it is reasonable and possible. See *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1977).

The inference that the defendant or his companion, or both, fired the fatal shots was both a reasonable and possible one for the jury to draw in this case. Mary Pitts testified that the gunshots which she heard came from the area where only the defendant, his companion, and the victims had gathered. Furthermore, there was evidence that the defendant fled the scene, hid from the police when they came to his father's apartment, and gave inconsistent stories about his activities on the evening in question, all of which are actions that evince a consciousness of guilt. *Commonwealth* v. *Anderson,* 396 Mass. 306, 312-313 (1985). It was not necessary for the Commonwealth to exclude the possibility that the shots were fired from somewhere else, so long as the record as a whole supports, as it does, the conclusion of guilt beyond a reasonable doubt. See *Commonwealth* v. *Mazza,* 399 Mass. 395, 398-399 (1987), and cases cited.

For the same reasons, the absence of direct evidence that the unidentified companion fired the shots does not under-

mine the Commonwealth's theory of a joint venture. Direct evidence of who shot the victims "is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot" the victims. *Commonwealth* v. *Casale,* 'supra at 174. A joint venture exists when the defendant "was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Costa,* 407 Mass. 216, 224 (1990), quoting *Commonwealth* v. *Longo,* 402 Mass. 482, 486 (1988). The jury were warranted in disbelieving the defendant's testimony that he was not present at the scene. From the evidence in this case, the jury were warranted in concluding that the defendant, even if he did not fire either of the fatal shots, shared the required state of malice aforethought with the unknown assailant. "The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). Finally, the jury were warranted in concluding that the defendant, even if he fired no shots, by acting in concert with his companion, especially in pushing Johnnie Shivers out of the way to facilitate a clearer shot at Kevin Shivers, intentionally assisted his companion in the shootings and exhibited the deliberate premeditation necessary to support a conviction of murder in the first degree. For these reasons, the judge's denial of the defendant's motion for required findings of not guilty was proper.

2. *Prosecutorial misconduct.* The defendant makes several arguments on appeal concerning alleged improprieties on the prosecutor's part during trial: (a) the prosecutor's opening statement improperly implied that the defendant had a criminal record; (b) while cross-examining the defendant, the prosecutor improperly waved a mug shot and a "police sheet" regarding the defendant's brother in front of the jury; (c) the prosecutor mischaracterized the defense strategy; (d) the prosecutor argued facts that were not in evidence; (e) the

prosecutor interjected his personal belief into the trial proceedings; and (f) the prosecutor's characterization of an argument of defense counsel as a "red herring" was improper. None of these alleged improprieties, however, individually or collectively, warranted a mistrial or now warrants reversal. '

a. *The opening statement.* In his opening argument, the prosecutor, in describing what he intended to prove as to how the defendant was apprehended, made this statement: "The police found out who [the defendant] was. Mug shots were looked at and an identification was finally made . . . ." The prosecutor, however, never introduced evidence at trial as to how the defendant was identified or that the defendant had a criminal record. The defendant contends on appeal that the prosecutor improperly insinuated that the defendant had a bad character. Because the defendant failed to object at trial, our review under G. L. c. 278, § 33E, is limited to whether there is error, and if so, whether there is a substantial likelihood of a miscarriage of justice. *Commonwealth v. Shea*, 401 Mass. 731, 735 (1988).

Generally, a prosecutor in a criminal action may state anything in his opening argument that he expects to be able to prove by evidence. *Commonwealth v. Fazio*, 375 Mass. 451, 454 (1978), and cases cited. That which "explains how the accusing finger came to be pointed at the defendant" is relevant. *Commonwealth v. Smith*, 29 Mass. App. Ct. 449, 451 (1990). Although use of the phrase, "mug shot," has been discouraged, see *Commonwealth v. Perez*, 405 Mass. 339, 344-345 & n.7 (1989), and such photographs themselves should be sanitized to avoid calling the jury's attention to their source, see *Commonwealth v. Blaney*, 387 Mass. 628, 638 (1982), the prosecutor's statement in this case does not create a substantial likelihood of a miscarriage of justice.

In analyzing a claim of improper argument, we must view the prosecutor's remarks not only in the light of the entire argument, but also in the light of the judge's instructions to the jury. *Commonwealth v. Bourgeois*, 391 Mass. 869, 885 (1984). The prosecutor began his opening statement by explaining that arguments of counsel are not evidence, and the

judge instructed the jury similarly at the close of the prosecutor's opening statement. Additionally, the prosecutor and defense counsel in their closing arguments, and the judge in his final charge, once again cautioned the jury that "arguments of counsel are not evidence." See *Commonwealth* v. *Breese*, 381 Mass. 13, 15-16 (1980) (where opening statement referred to testimony that did not materialize and record showed clear curative statements by prosecutor and instructions by judge, there was no abuse of discretion in denying dismissal or mistrial). "Moreover, it was a vague and fleeting comment, not likely to influence, or even to seize the attention of the jury." *Commonwealth* v. *Cunneen*, 389 Mass. 216, 223-224 (1983). There was no substantial likelihood of a miscarriage of justice.

b. *The cross-examination of the defendant.* During cross-examination, the prosecutor interrogated the defendant about the identity of the unidentified man who was there at the time of the murders. He attempted to imply that it might have been one of the defendant's two brothers. At that time defense counsel objected, stating, "I am aware that there is a sheet that looks like a police sheet, and counsel for the Commonwealth just asked about a mug shot. I mean, this is within a full view of the jury." Agreeing somewhat with defense counsel's statements, the judge stated to the prosecutor, "Well, you are flashing it around here . . . ." Defense counsel later added that, "This picture was in the Prosecutor's hand as he approached the witness, this picture is available to the view of the jury, he has been reading from a police sheet on the counsel table . . . ." Defense counsel then moved for a mistrial on the ground that it was prejudicial for the prosecutor to suggest to the jury that the defendant's brother had a criminal record. The judge denied defense counsel's motion. On appeal, the defendant contends both that he was prejudiced by the prosecutor's actions and that the judge should have granted his motion for a mistrial.

Whether to declare a mistrial is a determination that is within the trial judge's discretion. *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982). Although the judge

stated that the prosecutor was "flashing [one of these documents] around here," there is nothing in the record to indicate that the jury saw or could identify these documents. It is the trial judge who is "most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors." *Arizona* v. *Washington*, 434 U.S. 497, 514 (1978). Consequently, it is the trial judge who was best positioned to determine whether there was prejudice to the defendant. In these circumstances, there was no abuse of discretion in the judge's denial of the defendant's motion for a mistrial.

c. *Mischaracterization of the defense.* The prosecutor made the following statement in his closing argument: "So it seemed, I would suggest to you, from the evidence that was presented that there was a two-tiered kind of defense coming on here. First of all, I wasn't there; I was somewhere else. And it's a lot of places, but it's nowhere near there. But, if you find that maybe I was there somehow and you don't believe [the witness] and his two guys running down the street, that at least it was somewhat justifiable."[4] The defendant contends that this argument mischaracterized the defense theory of the case, that he had returned to the bar after his initial confrontation with Kevin Shivers, who accosted him with a knife, but that he ran away and was in a back room in his mother's apartment when he heard the gunshots. Because the defendant failed to object to this argument at trial, our review under G. L. c. 278, § 33E, is limited to whether there is error and, if so, whether there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Shea, supra.*

"If he speaks with propriety on matters on the record before the jury, a prosecutor may properly comment on the trial tactics of the defence and on evidence developed or promised by the defence." *Commonwealth* v. *Dunker,* 363

---

[4]Reggie White, a friend of the defendant's sister, testified that he saw two individuals, neither of whom was the defendant, running away from the murder scene shortly after he heard gunshots.

Mass. 792, 800 (1973), denial of habeas corpus aff'd sub nom. *Dunker* v. *Vinzant*, 505 F.2d 503 (1st Cir. 1974). See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 272 (1982). Several defense witnesses, including the defendant, had testified concerning an alleged second confrontation between Kevin Shivers and the defendant, in which Kevin Shivers allegedly assaulted the defendant with a knife, after he returned to the bar. Defense counsel alluded to this incident several times in his closing argument. Additionally, defense counsel requested an instruction on manslaughter based on Kevin Shivers's alleged attack on the defendant. In these circumstances, the prosecutor's suggestion that the defendant presented a two-tiered defense theory to justify his innocence was supported by the record, and there was no error.

d. *Arguing facts not in evidence.* The prosecutor made the following statement in his closing argument: "But I would suggest to you the gunshot is consistent with a right-handed man. I think you've probably seen [the defendant] writing during this case on the paper. Reach around and fire a shot in the center of the back, downward. He is taller." The defendant contends on appeal that no evidence at trial could lead to the inference that the fatal gunshot to Johnnie Shivers had been fired by a right-handed person, and that this inference by the prosecutor, coupled with his immediate designation of the defendant as right-handed, prejudiced the defendant. Once again, because defense counsel failed to object at trial, our review under G. L. c. 278, § 33E, is limited to whether there is error, and if so, where there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Shea, supra.*

Mary Pitts testified that the defendant and his unidentified companion were standing side by side when Johnnie Shivers was shot, so close that one "could say" that they were touching one another on the defendant's left side. Given this description, if the defendant, who was facing Mary Pitts, held a gun, it is likely that he held it in his right hand. While this is only a possible inference from the evidence, it is not entirely unreasonable. It was not improper for the prosecutor

to point out that the defendant was right-handed. Cf. *Commonwealth* v. *Smith*, 387 Mass. 900, 907 (1983) (proper for prosecutor to comment on defendant's demeanor where such comment did not suggest personal knowledge of the prosecutor). Additionally, both the prosecutor and defense counsel in their closing arguments, as well as the judge in his charge to the jury, cautioned the jury that arguments of counsel are not evidence. In these circumstances, there is no error.

e. *The prosecutor's interjection of his personal beliefs into the trial proceedings.* In his closing argument, the prosecutor stated that, "based on the evidence in this case, your decision is obvious. [The defendant] killed those two brothers." The prosecutor later made this argument in his closing: "Now, remember, [the defendant] made a big deal about the police being at his house between 12:00 and 1:00 and that the police lied. They didn't come at 5:00. They came between 12:00 and 1:00. Why is that? Why is that a big deal to him? Well, it's a lot more logical looking for cigarettes after you just get home before you go to bed than it is to be in a closed, dark closet looking for cigarettes at 5:00 A.M. Yeah. It looks like pretty guilty stuff. So he wants to back it up. He wants it to be between 12:00 and 1:00." The defendant contends that these statements interjected the prosecutor's own personal beliefs into the trial proceedings.

Regarding the prosecutor's use of the term "obvious," he interjected no extraneous material or belief into the trial proceedings, and, at most, he expressed his view of the strength of the evidence. This argument was proper. See *Commonwealth* v. *Smith*, 387 Mass. 900, 906-907 (1983).

As for the defendant's contention that the prosecutor improperly interjected his personal belief into the trial proceedings when he said that the defendant's hiding in the closet "looks like pretty guilty stuff," we believe that the defendant has misconstrued the thrust of the prosecutor's argument. A fair reading of the prosecutor's argument leads us to believe that the prosecutor was commenting on the discrepancy between the defendant's testimony that the police apprehended him between midnight and 1 A.M., and police officers' testi-

mony that they apprehended him around 5 A.M. It was rea-
sonable for the prosecutor to suggest to the jury that the de-
fendant contrived his story about being arrested earlier than
the police reported because it would have diminished his
credibility if he testified that he was looking for cigarettes in
his closet at 5 A.M. It was proper for the prosecutor to com-
ment on the credibility of the defendant as a witness, see
*Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990),
and there was no error.

f. *The "red herring" argument.* During the cross-examina-
tion of Detective Richard W. Walsh, one of the arresting of-
ficers, defense counsel asked the following question: "Did
you, as a result of, or while he was in custody, did you con-
duct any kind of paraffin tests or any kind of tests, regarding
that powder?" Detective Walsh answered in the negative.
There was no other evidence or testimony concerning the
failure of the police to conduct any such tests. In his closing
argument, defense counsel commented extensively on the
lack of such tests.[5]

The prosecutor responded to defense counsel's argument
by characterizing it as a "red herring," which he described
etymologically in hunting terms.[6] The defendant argues on

---

[5]Defense counsel argued as follows: "Now, one of the things that I'd like
to mention before I conclude simply is that the police had it within their
power to make certain scientific tests with respect to the defendant. They
could have made the tests to determine whether or not there was gunpow-
der or something of that sort. It would have been a natural and logical
test, I would submit to you, for the police department to make considering
the accusations. But there was no mistake. I mean, they knew when they
went down and arrested the defendant that this involved allegedly a shoot-
ing; and they could have made these tests. And I would suggest to you that
the reason they didn't make this test is because the police department had
already concluded that the defendant didn't do any shooting.

". . .

"But, you know, you should ask yourselves about that. You should ask
yourselves about that. How come? How easy for them to have done this, to
have made this kind of scientific examination of the defendant to see what
the story was. And they didn't do it."

[6]The prosecutor's entire argument on this issue is as follows: "Another
form of nonevidence. Could the Commonwealth have done some creative
test to tell whether or not this guy fired a weapon. That's nonevidence.

appeal that the prosecutor's depiction of the defendant's argument as a "red herring" was a deliberate attempt to trick the jury and, by doing this, the prosecutor overstepped the bounds of propriety. The defendant failed to object at trial, but we see no error. *Commonwealth* v. *Shea, supra.*

We have often stated that defense counsel's trial tactics are not immune from comment in a prosecutor's closing argument provided the comment is based on evidence heard by the jury. *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 272 (1982), and cases cited. It is not improper for the prosecutor to suggest to the jury that the defendant attempted to "fool" them. *Commonwealth* v. *Cameron*, 385 Mass. 660, 669-670 (1982). It is also not improper for a prosecutor to comment on a defendant's attempt to confuse or distract the jury by diverting their attention from the strong evidence of the defendant's guilt. *Commonwealth* v. *Shea*, 401 Mass. 731, 739 (1988). The use of the phrase, "red herring," therefore, to describe the defendant's closing argument concerning the lack of a gunpowder test on the defendant was not improper, although it was not an appropriate choice of terms.

Much more troubling, however, was the prosecutor's depiction of the jury as the "hunter" and the defendant as the "hunted." It is hard to imagine a more potentially prejudicial analogy for the role of the jury and the status of the accused than that of a "hunter" and a "hunted" prey. In the circumstances of this case, however, there is no substantial likeli-

---

You haven't heard anything about a test. You haven't heard an expert come in and say there is such a test, first of all. You haven't heard anybody testify that the Commonwealth has a right to test somebody in that way. What is that? That is what they call a red herring. A red herring is a common expression; you've probably all heard it. Some people don't know exactly what it means. It is an old hunting term. When the hunter is pursuing the hunted, in your case, seeking the truth, somebody else, the hunted, to get the hunter off the trail, drags a fish across the trail. So the hunting dogs, instead of going after the truth, in your case, they go off on a tangent somewhere on some test that may or may not even exist or some witness who has nothing to say in this case. That is what [defense counsel] wants you to do. He doesn't want you to confront the evidence and weigh the evidence. Because, based on the evidence in this case, your decision is obvious. [The defendant] killed those two brothers."

hood of a miscarriage of justice. The prosecutor's analogy was confined to this limited argument of defense counsel. Defense counsel himself had gone far beyond the bounds of a reasonable inference from the evidence at trial when he argued that the police failed to test the defendant for gunpowder because they had already concluded that he did not fire the fatal shots. See *Commonwealth* v. *Bradshaw, supra* at 277 (no substantial risk of a miscarriage of justice where inappropriate remarks of opposing counsel neutralized each other). Although the defendant had a right to do so, he failed to introduce any evidence of scientific tests that could have been performed on the defendant, outside of a single vague and unconnected question to Detective Walsh. See *Commonwealth* v. *Pettie*, 363 Mass. 836, 840-841 (1973). Cf. *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980); *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979). This is not a case, therefore, in which the prosecutor inappropriately characterized the central thrust of the defense theory of the case. See *Commonwealth* v. *Simmons*, 20 Mass. App. Ct. 366, 370-372 (1985) (inappropriate characterization of core of defense strategy did not create a substantial risk of a miscarriage of justice). Additionally, the judge gave clear, strong, and correct instructions on the presumption of innocence, the factors for judging credibility and drawing inferences from the evidence, the Commonwealth's burden of proof, and the fact that arguments of counsel are not evidence. See *id.* at 372. In these circumstances, there is no substantial likelihood of a miscarriage of justice.

3. *Ineffective assistance of counsel.* The defendant raises several arguments on appeal alleging that he was denied the effective assistance of counsel.[7] We have already determined that the defendant was unable to show that several unpreserved claims of error posed a substantial likelihood of a miscarriage of justice. Consequently, the defendant cannot prevail on appeal by asserting the ineffectiveness of his counsel on the same issues. *Commonwealth* v. *Wright*, 411 Mass.

---

[7]The defendant is represented by other counsel on appeal.

678, 682 (1992). The defendant's other arguments concerning the ineffective assistance of counsel include: (a) defense counsel's waiver of all opportunities to make an opening statement; (b) defense counsel's failure to object to the admission of dying declarations; and (c) the failure of defense counsel to prepare jury instructions and to object to allegedly incorrect jury instructions.

When addressing a claim of ineffective assistance of counsel, this court must undertake "a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "When the arguably reasoned tactical or strategic judgments of a lawyer are called into question, we do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.' *Commonwealth* v. *Stone*, 366 Mass. 506, 517 (1974). Instead, we require that such judgments be 'manifestly unreasonable' (*Commonwealth* v. *Adams*, [374 Mass. 722, 728 (1978)]), and this typically means loss of 'an otherwise available, substantial ground of defence.' " *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979). Under these standards, there is no merit to the defendant's arguments concerning the alleged ineffective assistance of counsel.

a. *The lack of any opening statement.* The defendant first argues that the failure of his trial counsel to make an opening statement either at trial or at the jury view was conduct that fell below the standard of an ordinary fallible lawyer and that deprived him of an otherwise substantial ground of defense. We have held that a defense counsel's perfunctory opening is not conduct that falls measurably below that which might be expected from an ordinary fallible lawyer, *Commonwealth* v. *Hartman*, 404 Mass. 306, 315 (1989), and

we now hold that a failure to make an opening statement similarly does not form the basis for a claim of ineffective assistance of counsel. Defense counsel's waiver of an opening statement has been held to be "trivial," a "tactical decision," and a "matter of professional judgment," as well as "within the realm of trial strategy." See *United States* v. *Salovitz*, 701 F.2d 17, 20-21 (2d Cir. 1983), and cases cited. In these circumstances, we shall not second guess the trial strategy of the defendant's trial counsel.

Even if we were to conclude that the conduct of defense counsel fell measurably below that of an ordinary fallible lawyer, the failure to make an opening statement did not deprive the defendant of an otherwise substantial ground of defense. The jury were presented with the defendant's case through several witnesses as well as defense counsel's closing arguments. The defendant argues that his attorney's failure to make an opening at the jury view deprived the defendant of the chance to advise the jury "to pay close attention to the proximity of neighboring houses and other areas" from which another gunman may have shot the victims. Defense counsel did, however, at the view, "ask the jury to observe the buildings across the street, the distance and the housing, and the direction of that tree that you see over there, if you could get an idea of what distance that is." Obviously, the defendant was not deprived of an otherwise substantial defense, and neither did his attorney's conduct fall below that of ordinary fallible counsel. There is no merit to the defendant's argument.

b. *Failure to object to dying declarations.* Mary Pitts testified that, after he was shot and lying on the sidewalk, Johnnie Shivers said, "I've been shot; call the ambulance, call the ambulance." She also testified that Kevin Shivers, after he was shot and had gotten into her car, stated, "They shot me, too, in the back," while Victoria Brown testified that Kevin had said, "They got me, too; they got me, too. In my back, in my back." The defendant argues on appeal that defense counsel should have objected to these statements, as dying

declarations, and that his failure to do so created a substantial risk of a miscarriage of justice.

Our brief answer to the defendant's argument is that there is no need to determine whether these statements were dying declarations because they were admissible under the spontaneous utterance exception to the hearsay rule. These statements were made under the influence of an exciting event and before the declarants had had time to contrive or fabricate the remarks. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990), and cases cited. Moreover, these statements also qualified, characterized, and explained the underlying event. See *id*. Consequently, any objection to the admission of these statements would have been futile, and defense counsel's failure to object to their admission, therefore, did not constitute ineffective assistance to the defendant.

c. *The instructions on consciousness of guilt.* While defense counsel did request that the judge instruct the jury on consciousness of guilt, defense counsel did not specifically request any particular wording in that charge and the judge gave a standard instruction on consciousness of guilt. On appeal, the defendant contends that his trial counsel's failure to propose specific instructions on consciousness of guilt and his subsequent failure to object to the judge's charge denied the defendant effective assistance of counsel because the judge's instructions permitted the jury to infer malice aforethought from the evidence of the defendant's consciousness of guilt.

While evidence of consciousness of guilt is not ordinarily relevant to the issue of malice aforethought, see *Commonwealth* v. *Lowe*, 391 Mass. 97, 108 n.6, cert. denied, 469 U.S. 840 (1984), *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605-606 (1978) (rarely is such evidence relevant to deliberate premeditation), and while the judge did not explicitly preclude the jury from inferring malice aforethought from the evidence of the defendant's consciousness of guilt, we fail to see any error. The judge properly instructed the jury on consciousness of guilt, and the judge later properly instructed the jury on malice aforethought. Presuming that the jury fol-

lowed the judge's instructions, we simply conclude that it was not logical for the jury to have inferred malice aforethought from the judge's instructions on consciousness of guilt. There was no error in the judge's instructions, and the defense counsel's failure to object, therefore, did not deny the defendant effective assistance of counsel.

4. *A third party's consciousness of the defendant's guilt.* Over the objection of defense counsel, police officers were allowed to testify that, when they went to the apartment of the defendant's father, he told them that the defendant was not home while he pointed to another room in the apartment and allowed the police to enter. The defendant argues on appeal that this evidence was not only inadmissible hearsay but also evidence of a third party's consciousness of the defendant's guilt and, therefore, irrelevant.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." McCormick, Evidence § 246, at 729 (3d ed. 1984), quoting Fed. R. Evid. 801(c). The father's statements, however, were not offered for the truth as to whether or not the defendant was in the apartment. They were offered instead, properly, on "the state of police knowledge which impelled the approach to the defendant." *Commonwealth* v. *Miller*, 361 Mass. 644, 659 (1972). Additionally, "an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." McCormick, *supra* at § 249, at 734. The defendant's father's statements, therefore, were admissible over defense counsel's objections.

The defendant's arguments concerning the relevancy of the defendant's father's consciousness of the defendant's guilt were not raised at trial, and the defendant cites no legal authority for this proposition on appeal. Our review is limited, therefore, under G. L. c. 278, § 33E, to whether there was error, and if so, whether there was a substantial likelihood of a miscarriage of justice. That the father was aware of his son's guilt would be an unlikely inference from the evidence

in the record, since no other evidence suggests that the defendant's father even knew about the murders before the police arrived at his apartment. Although it was open to defense counsel to do so, he sought no limiting instructions concerning the father's statements. Moreover, the prosecutor never argued to the jury that the father's conduct indicated consciousness of guilt, and the judge properly confined his instructions on consciousness of guilt to the defendant. In these circumstances, there was no error.

Having reviewed the entire record in fulfilment of our duty under G. L. c. 278, § 33E, we find no reason to disturb the verdicts.

*Judgments affirmed.*