Fahey, J.
The defendant stands indicted on charges of discharging a firearm, possession of a shotgun, assault and batteiy by means of a dangerous weapon causing serious bodily injury and armed assault with intent to murder. The defendant has moved to suppress statements he gave on September 1, 2003. The defendant claims he was questioned by the police after he exercised his Fifth Amendment rights and that his statements were not voluntary. For the reasons stated herein, the defendant’s motion to suppress statements is ALLOWED.
FINDINGS OF FACT
After hearing and consideration, I make the following findings of fact and reasonable inferences drawn therefrom.
Detective Jonathan Noone (“Det. Noone”) has been a Lowell police officer for the past ten years. Police investigation caused the police to have a reasonable basis to suspect that one “T-Bird” had been involved in a shooting in Lowell in the early morning hours of August 30, 2003. That morning a red van drove by 22 Ash Street while a passenger in the van shot at persons then in the driveway or outside the home. On September 1, 2003 at approximately 9:45 a.m., the police, including Det. Noone, went to 20 Auburn Street, Apartment #3 based on the information they had received. The police were wearing plain clothes at the time. After they knocked on the door to apartment #3, two young girls answered. When the police asked the girls for an adult to whom they could speak, a person they came to know as “Rat Boy” came to the door. The police asked Rat Boy if T-Bird was in the house. Rat Boy led the police into the kitchen of the apartment where the police waited while Rat Boy went to a bedroom.
The defendant came out of the bedroom shortly after this and the police identified themselves to him as police officers who were investigating a shooting incident that had occurred a couple of nights earlier. The police asked the defendant if he would come down to the police station for questioning. The defendant was not arrested at that point and was not placed in handcuffs. Rather, he voluntarily agreed to accompany the police to the station. I accept that, given what he was told, a reasonable person in the defendant’s shoes would have understood that he was not then in custody and did not have to accompany the police. The defendant sat in the rear seat of the cruiser with the doors unlocked. The police had not yet placed the defendant in custody. During the ride to the station, the defendant was not given his Miranda rights. The conversation en route to the station consisted only of the police asking him his name and what they should call him. The defendant said he should be called either Sam or T-Bone.
After arriving at the station at approximately 10:00 a.m., the police placed the defendant in an interview room. The interview room is approximately eight feet by eight feet. The police officers were in plain clothes although each officer carried their .45 caliber firearm. Although available, the police did not video- or audiotape their questioning of the defendant. There he remained unhandcuffed, unrestrained, and free to leave. In that interview room he was given Miranda warnings and indicated he understood them. He read aloud paragraphs one and two from the Miranda card back to the police and also indicated to them that he understood his Miranda warnings. Furthermore, he signed the Miranda card and told the police he was familiar with the warnings as he had spent some time in jail.
The police again told the defendant they were investigating a shooting from a couple of nights ago. The defendant said he was home with family members at the time of the shooting, but he was familiar with the shooting because he had read about it in the Lowell Sun. The police asked the defendant if he would consent to having his photograph taken so they could show his picture to witnesses to see if they recognized him as someone involved with the shooting. The defendant was shown a consent form for having a photograph taken. He read the form, indicated that he understood it, he did, in fact, understand it, and he signed it.
The police then escorted the defendant to the cell block area in the basement and photographed him. When returning from the basement to the interview room, the police took the defendant to the police garage and showed him the red van which had been seized during the course of the investigation. The defendant denied any knowledge of the van and said he had never been inside it. The police did not say to the defendant: “If I find you were inside the van, I’m going to lock you up for a long time.” However, the police did tell the defendant that they were investigating a very serious crime which carried a veiy lengthy penalty.
*148 The police then took the defendant back to the interview room and told him that they thought he was involved in the shooting, and if he had been, they would like to hear the defendant’s side of the shooting incident. The defendant maintained that he was not involved in the shooting until, at 10:26 am., he stated, “I have nothing more to say.” The police officers then picked up their notebooks and left the interview room. They were absent for no more than 15 minutes.
Meanwhile, the defendant’s photograph having been taken, it had been placed in an array, and shown to a cooperating witness. The witness selected the defendant’s photograph from the array. The police officers, including Det. Noone, who had previously left the interview room, learned during that 15-minute break, that the person who had been shot on August 30, 2003 had identified the defendant’s photograph from the array as that of the shooter. The police had a previous photograph of this defendant, but it was some 4-5 years old.
Sometime during this 15-minute period during which the police were absent, the defendant left the interview room and asked the police, “When can I leave?” The defendant was told to wait until the photo array was done and, if his photograph was not selected, then he would be given a ride home. It is clear that, by this time, the defendant was in police custody. The defendant returned to the interview room on his own and waited there alone for the two police officers to return.
Upon learning that the complaining witness had identified the defendant as the shooter, the two officers returned to the interview room and informed the defendant that he was under arrest. After placing the defendant under arrest, the police also informed him they would be applying for a search warrant to search 20 Auburn Street for the gun. The defendant lived at 20 Auburn Street with his extended family. The police told the defendant that he could save his family and any extended family living at 20 Auburn Street any inconvenience by telling the police where the gun was located. The defendant responded, “The last time I saw the gun was when I put it under the bushes.” The police then asked the defendant, “Where did you get the gun?” The defendant answered, “Connecticut.” At this point, the police asked if the defendant knew his Miranda warnings; he responded again that he had nothing more to say. The police did not re-advise the defendant of his Miranda warnings before telling him that they may apply for a search warrant for his home. The defendant’s statements were made in response to questions to the defendant initiated by the police.
RULINGS OF LAW
The defendant argues that his statements regarding the location of the weapon should be suppressed because the police failed to heed his prior request to terminate the interrogation. The defendant argues that he made such a request by declaring to the police, “I have nothing more to say.”
“It is clear that a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place.” Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982) (citing Commonwealth v. Brant, 380 Mass. 876, 884 (1980); Commonwealth v. Jackson, 377 Mass. 319, 325-26 (1979)). “If a defendant who has initially waived his right to remain silent wishes to later cut off questioning, however, he must ‘indicate in some manner’ that he is invoking the right previously waived.” Bradshaw, 385 Mass, at 265 (quoting Miranda v. Arizona, 384 U.S. 436, 473-74 (1966)). “For the rule of Miranda regarding the termination of questioning to apply, there must be either an expressed unwillingness to continue or an affirmative request for an attorney.” Commonwealth v. Pennallatore, 392 Mass. 382, 387 (1984).
Here, prior to informing the police of the location of the weapon, the defendant stated that he had “nothing more to say.” The defendant argues that this statement is a request to stop the interrogation. The interrogating officers’ conduct — immediately halting the interrogation and leaving the room with their notebooks — supports the defendant’s argument. Such a request to halt an interrogation by a defendant “must be interpreted in the context of his willingness to talk both immediately prior to and subsequent to the break” in the interrogation. Pennallatore, 392 Mass, at 387.
In Pennallatore, the defendant initially waived his Miranda rights and submitted to police interrogation. Thereafter, during an intense portion of the interrogation, the defendant asked the police, “Can we stop please?” The police took a short break, returned with a can of soda for the defendant, and resumed questioning. Pennallatore subsequently confessed to the crimes in response to police interrogation. Because Pennallatore indicated a willingness to proceed after the break, his subsequent responses to police questioning were deemed admissible. The Supreme Judicial Court found “no indication on record that Pennallatore’s request to stop was meant to be an assertion of his right to remain silent or stop the questioning permanently.” Pennallatore, 392 Mass, at 387-88.
Likewise, in Bradshaw, after initially waiving his Miranda rights, Bradshaw told the police, “I don’t want to talk.” The Supreme Judicial Court found that Bradshaw’s conduct after saying he did not want to talk indicated the statement was not an assertion of his right to stop questioning.[1] Bradshaw responded to the officers’ next question without hesitation or the need for further encouragement. Moreover, Bradshaw interrupted the officers and continued speaking several times when they attempted to conclude the interview. Overall, the SJC was left with the impression that *149 Bradshaw was a man who wanted to talk, not one who was forced to talk. Bradshaw, 385 Mass, at 264-66.
Here, the defendant indicated that he had nothing more to say, and the police immediately stopped the interrogation. The defendant then asked to leave the station and was told he must wait for the witness to view his photograph. Then, after compiling a witness identification as additional evidence against the defendant, the police arrested him. The police also told the defendant they were going to get a search warrant, and explained that he would save his family the inconvenience which would be caused by execution of the warrant if he told the police the location of the gun.
This interrogation is different in character to the post-termination statements in both PennaUatore and Bradshaw. In the case at bar, the defendant did not speak until the officers gave him the further encouragement of saving his family the trouble of a search. Moreover, the defendant’s position changed between the time the interrogation ceased and when it resumed because the officers arrested the defendant in the meantime. The police placed the defendant under more pressure to speak during the second interrogation than when he initially terminated the questioning. As the defendant only responded after further encouragement from the police, the defendant’s motion to suppress is ALLOWED.
ORDER
For the foregoing reasons, the defendant’s motion to suppress statements is ALLOWED.

The Court was also convinced that the police did not hear the defendant’s assertion.